**JEFFERSON STANDARD LIFE INSURANCE COMPANY, a Corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Nos. C–66–G–63, C–194–G–63.**

United States District Court
M. D. North Carolina,
Greensboro Division.

Aug. 15, 1967.

William J. Adams, Jr., and Charles G. Powell, Jr., Greensboro, N. C., and Fred W. Peel, Washington, D. C., for plaintiff.

William H. Murdock, U. S. Atty., Greensboro, N. C., Richard C. Pugh, Acting Asst. Atty. Gen., Myron C. Baum, Thomas L. Stapleton and Leon W. Vaseliades, Attorneys, Department of Justice, Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWIN M. STANLEY, Chief Judge.

The plaintiff, Jefferson Standard Life Insurance Company, seeks by these actions to recover of the defendant, United States of America, Federal income taxes allegedly overpaid with respect to the years 1958 and 1959. In its answers, the defendant, in addition to denying liability to the plaintiff, asserts counterclaims with respect to additional income taxes assessed against the plaintiff for the years 1958 and 1959. The plaintiff, by replies timely filed, denies liability for the deficiency assessments asserted in the counterclaims.

The cases were tried by the Court without a jury. At the conclusion of the trial, the parties stipulated that, because of the numerous and complicated issues involved, and in the interest of obtaining a decision at the earliest possible date, it would be agreeable for the Court to dispense with its customary practice of writing opinions in non-jury cases, and confine its decision to findings of fact and conclusions of law.

The Court, after giving due consideration to the pleadings and the evidence, including exhibits and stipulations, the requests and briefs submitted by the parties, and oral arguments of counsel, now makes and files herein its Findings of

Fact and Conclusions of Law, separately stated:

### FINDINGS OF FACT

#### I

##### *General Findings*

1. The facts herein found are applicable with respect to the taxable years 1958 and 1959, except as otherwise stated or indicated.

2. Jefferson Life Insurance Company (hereinafter referred to as "Jefferson"), and Pilot Life Insurance Company (hereinafter referred to as "Pilot"), are domestic stock life insurance companies duly incorporated and existing under the laws of the State of North Carolina, and engaged in business as life insurance companies as defined in § 801(a) of the Internal Revenue Code of 1954, as amended (hereinafter referred to as "the Code"). The principal office of Jefferson is located at Jefferson Square in the City of Greensboro, Guilford County, North Carolina, and the principal office of Pilot is located at Sedgefield, Guilford County, North Carolina.

3. Jefferson owns all the outstanding capital stock of Pilot, and Jefferson and Pilot duly elected to file consolidated income tax returns for the years 1958 and 1959.

4. Jefferson duly and timely executed and filed with the District Director of Internal Revenue for the District of North Carolina Federal income tax returns (the same being consolidated returns applicable to Jefferson and its subsidiary, Pilot, as permitted by law), for the taxable (and calendar) year 1958, and for the taxable (and calendar) year 1959.

5. As provided by law, Jefferson's subsidiary, Pilot, duly consented to and authorized the filing of said consolidated income tax returns, and pursuant to applicable laws and regulations, Jefferson, both on its own behalf and as the duly authorized agent of its subsidiary, Pilot, was entitled to file in its sole name said consolidated income tax returns for the years 1958 and 1959, and to file in its sole name the claims for refund hereinafter mentioned.

6. Jefferson, both on its own behalf and as the duly authorized agent of its said subsidiary, Pilot, is entitled, in its sole name, to institute and prosecute these actions, and to receive the amounts of refund, if any, which the Court may adjudge to be due Jefferson in these actions.

7. Jefferson's tax return for the year 1958 reported a tax liability for said taxable year in the amount of $7,213,-029.00, and this tax was duly and timely paid to the District Director of Internal Revenue for the District of North Carolina.

8. Jefferson's tax return for the year 1959 reported a tax liability for said taxable year in the amount of $7,280,350.00. However, of said reported amount, $292,-906.00 represented Jefferson's liability for the transitional tax for the year 1957, arising under the provisions of § 818(e) of the Code. Thus, the amount of tax shown to be due by Jefferson's return for the year 1959, exclusive of said 1957 transitional tax, was $6,987,444.00. Under the mentioned statute, Jefferson is allowed to pay its 1957 transitional tax in ten equal annual installments. Accordingly, with respect to the year 1959, Jefferson duly and timely paid to the District Director of Internal Revenue for the District of North Carolina the amount of $6,987,444.00, plus $29,291.00 representing one-tenth of said 1957 transitional tax, or an aggregate amount of $7,016,735.00.

9. At all times referred to herein, the District Director of Internal Revenue for the District of North Carolina was the agent of the defendant duly authorized by law to accept and collect, on behalf of the defendant, payments of the aforementioned income taxes made by Jefferson and, consequently, payment of said income taxes to the said District Director of Internal Revenue for the District of North Carolina constituted a payment of said taxes to the defendant.

10. Jefferson duly filed, pursuant to the provisions of § 6511 and § 7422(a)

of the Code, and within the time required by law, with the defendant, through its authorized agent, the District Director of Internal Revenue for the District of North Carolina, claims for refund for certain amounts paid to the defendant on account of Jefferson's income tax returns for the years 1958 and 1959, and for lawful interest thereon, and for such additional refund or other relief to which it might be lawfully entitled, and alleged by Jefferson to have been erroneously and illegally assessed against, and collected from, Jefferson by the defendant. These actions, based upon said claims for refund, were timely instituted.

11. By orders duly entered, the Court granted motions of the defendant to amend its answers by adding counterclaims with respect to additional income taxes asserted and assessed against Jefferson for the years 1958 and 1959. The amendments were timely filed and served upon Jefferson. Jefferson, by replies to the amended answers, and the counterclaims therein set forth, which replies were timely filed and served upon the defendant, denied liability for said adjustments to its income tax liabilities, and for the deficiency assessments made by the defendant and referred to in its counterclaims, to the extent and for the reasons set forth in its replies.

II

*The Applicable Rate of Tax*

12. Both Jefferson and Pilot are life insurance companies subject to the tax imposed under § 802 of the Code.

13. The form 1120 L, corporate income tax return provided by the Internal Revenue Service for use by life insurance companies subject to the tax imposed by § 802 of the Code for 1958 and 1959, specified a tax of 30 percent on amounts not over $25,000.00 and 52 percent on amounts in excess of $25,000.00. Said form further specified, in the event a consolidated return was filed, a tax of 32 percent on amounts not over $25,-000.00 and 54 percent on amounts in excess of $25,000.00. Jefferson computed

and paid tax at the latter rates on its consolidated returns for 1958 and 1959.

14. The form 1120, corporate income tax return for corporations subject to the tax imposed under § 15 or § 204 of the Internal Revenue Code of 1939, with respect to such returns for each of the years 1942 through 1953, contained the question: "Is this a consolidated return?" Said form further contained, in the computation of the tax for such corporations, a parenthetical reference to a higher tax rate in the case of consolidated returns.

15. The form 1120 L, corporate income tax return for life insurance companies subject to the tax imposed under § 201 of the Internal Revenue Code of 1939, with respect to returns for each of the years 1942 through 1953, contained the question: "Is this a consolidated return?" However, said form contained no reference, in the computation of tax for life insurance companies, to a higher tax rate, or to an additional tax in the case of consolidated returns.

16. The form 1120, corporation income tax return for corporations subject to the tax imposed under § 11(c) or § 831 of the Internal Revenue Code of 1954, with respect to returns for each of the years 1954 through 1957, contained the question: "Is this a consolidated return?" Said form further contained, in the computation of the tax for such corporations, a parenthetical reference to a higher tax rate in the case of consolidated returns.

17. The form 1120 L, corporate income tax return for life insurance companies subject to the tax imposed under § 802 of the Internal Revenue Code of 1954, with respect to the returns for each of the years 1954 through 1957, contained the question: "Is this a consolidated return?" However, said form contained no reference, in the computation of the tax for life insurance companies, to a higher rate or an additional tax in the case of consolidated returns.

18. The form 1120, corporate income tax return for corporations subject to the tax imposed under § 11(c) or § 831

of the Internal Revenue Code of 1954, with respect to returns for the years 1958 and 1959, in the computation of tax for such corporations, contains a parenthetical reference to a higher tax rate in the case of consolidated returns. These returns also contain the question: "Is this a consolidated return?"

19. The form 1120 L, corporate income tax return for life insurance companies subject to the tax imposed under § 802 of the Internal Revenue Code of 1954, with respect to returns for the years 1958 and 1959, in the computation of the tax for such life insurance companies, contains a parenthetical reference to a higher tax rate in the case of a consolidated return. This form also contains the question: "Is this a consolidated return?"

### III

### *Determination of Consolidated Taxable Income*

20. Jefferson acquired 100 percent of the outstanding stock of Pilot by purchase prior to 1958, and at a time when Pilot's net worth was equal to the purchase price paid by Jefferson for said stock.

21. In each of the years 1958 and 1959, Pilot paid dividends in the amount of $1,250,000.00 to Jefferson out of current earnings and profits of the year.

22. Pilot was solvent at all times during 1958 and 1959.

23. For the years 1958 and 1959, Jefferson and Pilot elected to file consolidated Federal income tax returns. In both returns, Pilot and Jefferson were treated as parts of a single entity. The computations of taxable investment income (Phase I) and gain from operations (Phase II), made in determining the income tax of life insurance companies, were made by consolidating the figures for the two companies on an item-by-item basis, eliminating from all computations the intercompany dividends and the intercompany investments.

24. The dividends distributed by Pilot to Jefferson during 1958 and 1959 did not reduce Pilot's assets to a point where they were inadequate to satisfy its liabilities to creditors and the requirements for reserves for its policies required under the law.

25. At all times during 1958 and 1959, the assets of Jefferson were adequate to satisfy its liabilities to creditors and the requirements for reserves for its policies without taking into account either Jefferson's investment in the stock of Pilot or the amount received as dividends from Pilot.

26. In 1958 and 1959, Jefferson, for purposes of Phase I (consolidated taxable investment income), computed a consolidated investment yield figure and a consolidated policy and other contract liability requirements figure. The investment yields of the two separate companies were combined and the intercompany dividend paid by Pilot to Jefferson was entirely eliminated to arrive at a consolidated investment yield. In determining a consolidated policy and other contract liability requirements, the assets of the two separate companies were combined with the investment in the stock of Pilot held by Jefferson eliminated to arrive at consolidated assets. A current earnings rate was obtained by dividing the consolidated investment yield by the consolidated assets. Earnings rates for the preceding years were determined in the same manner, and an adjusted reserves rate was computed from these earnings rates. The life insurance reserves of the two companies were combined to arrive at consolidated life insurance reserves. The adjusted life insurance reserves were computed by using the consolidated life insurance reserves, the average rate of interest assumed on the consolidated life insurance reserves, and the adjusted reserves rate determined by using consolidated investment yields and consolidated assets. The consolidated policy and other contract liability requirements were determined by multiplying the adjusted life insurance reserves by the adjusted reserves rate and by combining the interest paid by

the two companies. Further, in 1959, the applicable portions of pension plan reserves of the two companies were combined to arrive at consolidated pension reserves, and the consolidated pension reserves were multiplied by the current earnings rate. A policyholders' share percentage was determined on the basis of the consolidated policy and other contract liability requirements and consolidated investment yield. This policyholders' share percentage was applied to the items of consolidated investment yield to determine a policyholders' share of consolidated investment yield and a company's share of consolidated investment yield. Only one $25,000.00 small business deduction was taken into account in each of the years 1958 and 1959.

27. For 1958 and 1959, Jefferson, for purposes of Phase II (consolidated gain from operations) computed a consolidated required interest figure and a consolidated investment yield figure. The investment yields of the two separate companies were combined and the intercompany dividend paid by Pilot to Jefferson was entirely eliminated to arrive at a consolidated investment yield. In determining a consolidated required interest figure, the life insurance reserves of the two companies were combined and required interest was computed on the combined life insurance reserves of the two companies. A percentage of investment yield set aside for policyholders was determined on the basis of the consolidated required interest and the consolidated investment yield. This percentage was applied to the items of consolidated investment yield to determine a share of consolidated investment yield set aside for policyholders and a company's share of consolidated investment yield. In computing the increase in reserves which is required by § 810(b) and allowed as a deduction by § 809(b)(2) of the Code, Jefferson, for 1958 and 1959, reduced the consolidated increase in reserves by the share of the consolidated investment yield set aside for policyholders under § 809(a)(1) of the Code. Only one $25,000.00 small business deduction was taken into account in each of the years 1958 and 1959.

28. Jefferson's method of consolidation used on its tax returns results in a consolidated policyholders' share for purposes of Phase I which will not be equal to the sum of separate policyholders' shares of Jefferson and Pilot. For example, based upon the figures contained in the Revenue Agent's report for 1958, a consolidated policyholders' share for Phase I computed in accordance with Jefferson's method of computation would be $20,335,417.00, and separate policyholders' shares of Jefferson and Pilot, computed in accordance with the defendant's method, would be $15,665,587.00 for Jefferson and $4,671,952.00 for Pilot, or a total of $20,337,539.00, or $2,122.00 more than the policyholders' share under the method employed by Jefferson. Based upon the figures contained in the Revenue Agent's report for 1959, a consolidated policyholders' share for Phase I computed in accordance with Jefferson's method of computation would be $22,056,815.00, and separate policyholders' shares of Jefferson and Pilot, computed in accordance with the defendant's method, would be $16,888,052.00 for Jefferson and $5,156,668.00 for Pilot, or a total of $22,044,720.00, or $12,095.00 less than the policyholders' share under the method employed by Jefferson.

29. Upon audit of Jefferson's consolidated income tax returns for 1958 and 1959, the Commissioner of Internal Revenue disapproved Jefferson's method of computing its taxable income. The method employed by the Commissioner in the Revenue Agent's report was as follows:

(a) The Commissioner in determining the taxable investment income of Jefferson for purposes of Phase I investment income, first and prior to any consolidation, separately computed each company's policy and other contract liability requirements. This amount for each company was arrived at in accordance with the provisions covering the determination of policy and other contract liability requirements of separate companies. For purposes of these separate computations,

the dividends received by Jefferson from Pilot were included in the gross investment yield of Jefferson and the value of the Pilot stock held by Jefferson was included as an asset of Jefferson. The policyholders' share exclusion for Jefferson was calculated by dividing its investment yield by assets and applying the earnings rates so obtained to its adjusted reserves. The policyholders' share of Pilot was obtained in the same manner. The ratio of the policy and other contract liability requirements of each company to its gross investment yield was then applied to each and every item of investment income to determine the policyholders' share of each item of its investment income.

(b) When the time came (Schedule C of the tax returns) to allocate (on the basis of the ratio as determined in (a) above) each and every item of investment yield between the company and the policyholders, the dividend received portion of consolidated investment yield was first reduced by 100 percent of the Pilot dividends prior to allocation. Having thereby eliminated 100 percent of the Pilot dividends in the course of consolidation, that portion of the policyholders' exclusion of dividends received was reduced by the amount attributable to the Pilot dividends.

(c) Similarly, in determining taxable income for purposes of Phase II, gains from operations, separate figures for gross investment income and investment yield were computed for each company. In the computation of the exclusion of the share of investment yield set aside for policyholders of Jefferson under § 809(a) of the Code, the Pilot dividends and the value of Pilot stock were included. Each company's separately determined "required interest" was divided by its investment yield to obtain each company's policyholder exclusion percentage. The allocation of each item of investment yield and the treatment of the Pilot dividend was handled in the same manner as described in (b) above.

30. At the trial of these actions, the defendant presented another method of computing consolidated taxable investment income. This method also utilized separately computed policy and other contract liability requirements and investment yields determined without eliminating either the intercompany dividends paid by Pilot to Jefferson or the investment in the stock of Pilot held by Jefferson. A policyholders' share percentage was determined for each company on the basis of the separately determined policy and other contract liability requirements and investment yields. This policyholders' share percentage for each company was applied to the individual items of investment yield for each company to determine a policyholders' share to be excluded for that company. The intercompany dividends paid by Pilot to Jefferson were not eliminated from the separately determined investment yield of Jefferson. Consolidated investment yield was determined by combining the individual items of investment yields of the two companies and without excluding the intercompany dividends paid by Pilot to Jefferson. The policyholders' share of consolidated investment yield was determined by combining the separately determined policyholders' shares of investment yield. This policyholders' share of consolidated investment yield was subtracted from the consolidated investment yield that included the intercompany dividends to arrive at a company's share of consolidated investment yield. This company's share was then reduced by eliminating a portion of the intercompany dividends equal to the percentage which the separately determined Jefferson company's share was of the separately determined Jefferson investment yield. One $25,000.00 small business deduction was taken into account in each of the years 1958 and 1959. The consolidated taxable investment income computed under this method was the same as consolidated taxable investment income computed in the Revenue Agent's Report.

31. At the trial of these actions, the Government also presented another method of computation of consolidated gain

from operations. This method likewise utilized separately determined required interests and investment yields. The separate investment yields were determined as if each company was filing a separate return without excluding the intercompany dividends paid by Pilot to Jefferson. A percentage for share of items, investment yield set aside for policyholders was determined for each company on the basis of the separately determined required interests and investment yields. This percentage for each company was applied to the individual items of investment yield for each company to determine a share set aside for policyholders to be excluded for that company. The intercompany dividends paid by Pilot to Jefferson were not eliminated from the separately determined investment yield of Jefferson. Consolidated investment yield was determined by combining the individual items of investment yield of the two companies and without eliminating the intercompany dividends paid by Pilot to Jefferson. The share of consolidated investment yield set aside for policyholders was determined by combining the individual items of share of investment yield of the separate companies set aside for policyholders. This share of consolidated investment yield set aside for policyholders was subtracted from the consolidated investment yield that included the intercompany dividends to arrive at a company's share of consolidated investment yield. This company's share was then reduced by eliminating a portion of the intercompany dividends equal to the percentage which the separately determined Jefferson company's share was of the separately determined investment yield. This portion of the intercompany dividends was the only portion that was eliminated from consolidated gain from operation. Only one $25,000.00 small business deduction was taken into account in each of the years 1958 and 1959.

32. In both 1958 and 1959, Jefferson's gain from operations exceeded its taxable investment income, so that there was consolidated taxable income under both Phase I and Phase II.

33. The duties of the officers of Pilot are separate and distinct from the duties of the officers of Jefferson.

34. The officers of Jefferson do not exercise day-to-day operational control over Pilot's officers.

35. Jefferson sells only life insurance, while Pilot is known as a multiple line company in that it sells accident and health policies, both to individuals and to groups, in addition to selling life insurance.

36. The agents of Jefferson and Pilot work out of different agency offices.

37. No joint advertising is conducted which couples Jefferson and Pilot.

38. Under generally accepted accounting principles, a consolidated financial statement would not normally be prepared for Jefferson and Pilot. However, a consolidated income tax return is a form of financial statement that might be used for special purposes.

39. Jefferson does not prepare for distribution or publication any consolidated financial statements, and annual reports for stockholders for Jefferson and Pilot are separately prepared.

40. Generally accepted accounting principles of consolidation require the elimination of intercompany dividends in the preparation of consolidated statements of income, and such principles apply in the case of consolidated statements of life insurance companies as well as in the case of consolidated statements of ordinary business corporations.

41. Generally accepted accounting principles of consolidation further require, in the preparation of consolidated financial statements, the elimination of intercompany investments in the stock of a subsidiary, and such principles apply in the case of consolidated statements of life insurance companies as well as in the case of consolidated statements of ordinary business corporations.

42. The Commissioner does not dispute the right of Jefferson to file a con-

solidated tax return, but maintains that prior to consolidation separate computations must be made for each company to determine its policyholders' share exclusions.

43. A substantial portion of the investment income earned by a life insurance company is necessary to provide assets which, together with premium collections, will permit the company to meet its future obligations to policyholders.

44. In a typical life insurance company, approximately 80 to 85 percent of the liabilities represent liabilities to policyholders.

45. Approximately 75 to 80 percent of the assets of Jefferson and Pilot in 1958 represented obligations to policyholders.

46. From an accounting standpoint, the reserves required of an insurance company to meet obligations to its policyholders are considered as liabilities.

47. Jefferson reflects its policyholder reserves as liabilities, both for the purpose of its Annual Statement and its Report to Stockholders.

48. Contracts of insurance to individual policyholders run only to the issuing company, just as the liabilities of any individual company in an affiliated group run only to the individual company.

49. Since insurance companies have an obligation to properly protect their policyholders, sound accounting principles require the separate computation of the amounts which stand to protect the policyholders' share of each company before these interests may be consolidated.

50. The overriding concern of the State Insurance Commissioners is the protection of the policyholders, and the maintenance of sufficient reserves for the policyholders by individual companies. In examining Jefferson, no distinction is made by the Insurance Commissioner between the dividends Jefferson receives from Pilot as opposed to other sources of income. All such dividends are considered as available to meet Jefferson policyholder obligations. Further, in determining the adequacy

of Jefferson's reserves, the Pilot shares of stock are not excluded.

51. The Annual Statements of Jefferson filed with the Insurance Commissioner reflect the Pilot dividends and the Pilot stock held by Jefferson.

52. As of December 31, 1959, the carrying value of Pilot stock was increased by Jefferson in the amount of $7,500,-000.00. An amount equal to this increase, plus additional funds, was used to increase the reserves for Jefferson's policyholders for all years subsequent to December 31, 1959.

53. Under generally accepted accounting principles, the liabilities of an affiliated group of life insurance companies as a result of their obligation to policyholders, are computed and shown on a consolidated financial statement on the basis of the benefits to be paid under the policy contracts, the premiums collected and anticipated (net of underwriting expenses), and the assumptions made as to rate of return on investments and mortality among policyholders. Such liabilities, and the changes in such liabilities from year to year, are determined without regard to either the source of the amount of investment income received or earned by the companies during the year. Such liabilities are consolidated by adding together such liabilities for the separate insurance companies in the affiliated group.

54. The terms "policyholders' share of investment yield," "share of investment yield set aside for policyholders," and "policyholders' share," which are frequently used to describe figures used in the computations under the Life Insurance Income Tax Act of 1959, are different from the reserves which are required to be maintained by law for the protection of policyholders, and are different from increases in said reserves. Said quoted terms refer only to income tax concepts used in measuring the amount of certain income exclusions that are made in the computation of Federal income tax.

55. Since the dividends paid by Pilot to Jefferson in 1958 and 1959 were paid

from current earnings and profits, and Pilot had taxable investment income included in consolidated taxable investment income and investment yield included in consolidated gain from operations in both 1958 and 1959 in amounts in excess of the amount of the intercompany dividends, use of any portion of the intercompany dividends in such years to satisfy a portion of a policy or other contract liability requirements figure computed under Phase I for Jefferson, or to satisfy a portion of a required interest figure computed under Phase II for Jefferson, would satisfy such portions from income of Pilot that was subject to income tax in the same year. .

56. Neither the method of computation used by the defendant in the revenue agent's reports for 1958 and 1959, nor the method of computation used by the defendant in its illustrative exhibits presented at the trial of the cases, eliminated completely the intercompany dividends for purposes of either the Phase I or Phase II computations. Such intercompany dividends were not eliminated under such methods to the extent that they were used to satisfy policy and other contract liability requirements for purposes of Phase I, or to satisfy the required interest for purposes of Phase II.

57. Under generally accepted accounting principles of consolidation, in the case of a consolidated financial statement of two life insurance companies for a year in which an intercompany dividend is paid, no reduction is made in the sum of the net increases in policy reserves of the two companies by reason of elimination of the intercompany dividend.

58. The method of consolidation used by Jefferson for purposes of Phase I and Phase II computations on the consolidated returns for 1958 and 1959 reflected consolidated taxable investment income and consolidated gain from operations, and such method reached the same results as would have been reached if Jefferson and Pilot had merged prior to 1958 and had operated in 1958 and 1959 as a single life insurance company.

IV

### Branch Office Managers Supplemental Retirement Plan

59. On or about January 1, 1956, Jefferson, as an employer, established a Branch Office Managers Supplemental Plan, which is in evidence as Plaintiff's Exhibit 8. This Plan was in effect in the taxable years 1958 and 1959.

60. A purpose of the Branch Officers Supplemental Retirement Plan was to provide supplemental pension benefits to the managers to augment the benefits they could receive as a member of the Pension Plan for agents.

61. The Plan covered Jefferson's branch office managers who were in charge of regional sales offices throughout the country.

62. Each manager was automatically included in the Plan, and no consent was necessary.

63. Upon the adoption of the Plan, all branch officers were notified by letter of the provisions and application of the Plan, and persons subsequently becoming branch office managers were so notified when appointed as branch office managers.

64. Under the Plan, Jefferson was to make contributions to the Plan based upon the employee's salary. However, such contributions were not to be set apart or treated as separate funds, but were to constitute a part of the general corporate funds of the Company.

65. With respect to Jefferson's contributions, Section 5 of the Plan provided as follows:

"5. *COMPANY'S CONTRIBUTION.* Each year the Company will contribute to the Plan an amount equal to 4% of the Manager's compensation for each Manager who has not attained age fifty-five (55) during such year, and an amount equal to 5% of such compensation for each Manager who has attained age fifty-five or over during such year."

66. With respect to eligibility, Section 3 of the Plan provided as follows:

"3. *ELIGIBILITY FOR MEMBERSHIP.* All Branch Office Managers of the Jefferson Standard Life Insurance Company (hereinafter sometimes referred to as *Manager*) shall be eligible for membership in this Retirement Plan."

67. With respect to change or termination, Section 11 of the Plan provided as follows:

"11. *CHANGE OR TERMINATION OF PLAN.*

"(a) The Company hopes and expects to continue the Retirement Plan indefinitely but must necessarily reserve the right to change or discontinue it at any time, provided, however, no such change or discontinuance shall affect the right of any Manager to receive, upon attaining age sixty-five and if otherwise eligible hereunder, any benefits accrued to his account under this Plan prior to the effective date of such change or termination.

"(b) If at any time during the first ten years following the effective date of the Plan, the Plan shall be terminated and the full current cost of the Plan shall not have been paid, thereafter the Company's contributions which may be used for the benefit of any one of the twenty-five highest paid Managers on the effective date of this Plan whose benefits upon retirement exceed Fifteen Hundred ($1,500) Dollars per year, shall not exceed the greater of either (1) $20,-000 or (2) an amount computed by multiplying the smaller of (i) $10,000 or (ii) 20% of such Manager's compensation during the last five years of service, by the number of years since the effective date of the Plan. Any excess reserves arising upon the application of the foregoing provision shall be used and applied for the benefit of other participating Managers and retired participating Managers on the basis of the liabilities under the Plan on account of each of them."

68. With respect to annuity benefits, Section 6 of the Plan provided as follows:

"6. *ANNUITY BENEFITS.* The amount contributed by the Company each year will be used by it to provide a deferred life annuity for the Manager, with the first payment from said annuity to be made on the first day of the second month following the Manager's sixty-fifth birthday. The monthly annuity provided for by this paragraph shall be calculated on the basis of the net 1937 Male Standard Annuity Table with 3% interest."

69. Section 12(a) of the Plan provided as follows:

"(a) Membership in the Plan shall not affect the right of the Company to terminate any Branch Office Manager's contract. The Company's authority and control over its Managers and the terms of their employment shall be as absolute and unconditional as though this Retirement Plan had never been adopted, and no provision hereof, or action taken hereunder, shall be construed as giving to any member of the Plan the right to permanent employment with the Company."

70. With respect to forfeiture of benefits, Section 8 of the Plan provided as follows:

"8. *FORFEITURE OF BENEFITS.* If a Branch Office Manager's service as Branch Office Manager is discontinued prior to his sixty-fifth birthday, but if he remains a member of the Jefferson Standard Life Insurance Company Agents' Retirement Plan in accordance with its terms, the amount of annuity earned by such Manager as provided hereunder up to the date of such discontinuances of service as Branch Office Manager shall be paid to him beginning at age sixty-five. If at any time while under age sixty-five the Branch Office Manager ceases for any reason to be a member of the Jefferson Standard Life Insurance Company Agents' Retirement Plan, or if after retirement or termination of

employment the Manager shall die or shall become an employee of another life insurance company or shall act or contract to act as life insurance underwriter, agent or sales representative for any other company engaged in the business of selling life insurance, then all unpaid annuity payments and benefits provided herein shall be forfeited."

71. Regardless of the number of years an employee belonged to the Plan, and the amounts contributed by Jefferson to the Plan, the employee had no right to any cash value in the Plan.

72. No actual annuity contracts of any sort were issued to Branch Office Managers upon their inclusion in the Plan, and their annuity contracts consisted of the adoption of the Plan by Jefferson, the notification to Branch Office Managers of their rights under the Plan, and annual reports made to them by Jefferson.

73. Jefferson, as a part of its insurance business, issued life annuity contracts.

74. Ordinarily, once a life annuity is issued, Jefferson cannot, of its own accord, cancel the benefits.

75. Ordinarily, under life annuities issued by Jefferson, a policyholder has a right to any guaranteed cash surrender in the contract.

76. With respect to reserves, Section 10(b) of the Plan provided as follows:

"(b) The Company shall maintain a reserve for its obligation under all benefits guaranteed under this Plan. Each year the Pension Committee shall determine the amount of the Company's contributions required to meet the reserve under the Plan, and upon approval by the Company contributions shall be made accordingly.

All contributions made by the Company shall be added to such reserve, which reserve shall not thereafter be decreased, except by payment of benefits under the Plan, until all payments required under the Plan have been made."

77. Jefferson established a reserve for the Branch Office Managers Supplemental Retirement Plan computed on the basis of the 1937 Standard Annuity Mortality Table, with interest at the rate of three percent. This table is one of the tables specified in Section 58–201.1 of the General Statutes of North Carolina, and is one of the bases for annuity reserves approved by the Commissioner of Insurance of North Carolina. Jefferson used this table in computing reserves for annuity contracts issued by it, and it is widely used throughout the United States by other companies in computing reserves for annuity contracts.

78. The amount of the reserve set aside for the Branch Office Managers Supplemental Retirement Plan at the beginning of the year 1958 was $150,488.00, the amount of the reserve at the end of the year 1958 was $232,516.00, and the amount of the reserve at the end of 1959 was $309,752.00. These reserves were computed on recognized mortality tables and assumed rates of interest, and were included in Jefferson's regular reserve funds.

79. Jefferson maintained a separate valuation record sheet for each member of the Plan, showing information needed in connection with the administration of the Plan with respect to that member. The separate valuation record sheet also contained a determination of Jefferson's reserve liability with respect to the annuity provided under the Plan for that member.

80. Jefferson submitted the Plan to the Internal Revenue Service for a ruling as to whether it qualified under Section 401 of the Code. The Internal Revenue Service ruled that the Plan did not meet the requirements of Section 401 of the Code, citing the fact that the Plan discriminated in favor of the managerial category. This fact did not in any way affect Jefferson's determination as to the amount of the reserve under the Plan.

81. During 1958 and 1959 there were approximately 65 to 70 managers covered

under the Plan. The entire cost of the Plan was contributed by Jefferson.

82. Over a dozen of the branch office managers covered by the Plan in 1958 and 1959 were later retired and each of them received benefits under the Plan. Some of the branch office managers who had been covered under the Plan prior to 1958 and 1959 retired in those years and received benefits under the Plan.

83. One of the purposes for which the Insurance Commissioner examined Jefferson's reserves was to determine if they were inadequate or excessive, and on the proper tables. The Insurance Commissioner requires a reserve if there is any doubt whatever that the company may be liable.

84. The Insurance Commissioner would reduce, or recommend that a reserve be reduced or excluded, when such reserves were twice included as liabilities.

85. For purposes of the annual statements filed with the State Insurance Commissioner and the Federal income tax returns filed for the years pertinent herein, the contribution of Jefferson to the Plan was carried as an income item, the actual payments made to retired managers during the year were shown as annuity benefit payments; the amount of the insurance in reserve was shown as a deduction for increase in reserves in the summary of operations; and the cost of the Plan to Jefferson was shown as a general business expense.

86. If a branch office manager ceased to be a manager, but continued as an agent and member of the Agents' Pension Plan, all credits set aside for his benefit under the Branch Office Managers Plan remained to his credit and were payable to him, beginning at age 65.

87. The Commissioner treated the Plan as a deferred compensation Plan, allowing in full all deductions based on actual benefits paid to employees, eliminating the contributions both as a deduction and as an income item, and eliminating amounts designated as funding for the Plan from life insurance reserves, for purpose of computing policy and other contract liability requirements, required interest and increases in life reserves.

V

*Computations for Annual Statement*

88. The National Association of Insurance Commissioners (hereinafter referred to as N.A.I.C.), is a national organization composed of the officials of the various states who are charged with the supervision of insurance affairs. It was organized in 1871. Soon after its organization, the N.A.I.C. adopted a uniform Annual Statement blank, and the Annual Statement forms that have been filed by insurance companies since that time have been forms approved by the N.A.I.C.

89. Jefferson and Pilot were each required by the laws of the State of North Carolina and of the other states in which they did business, to complete and file the Annual Statement form approved by the N.A.I.C.

90. Both the Annual Statement form and the instructions for its completion were prepared and approved by the N.A.I.C.

91. State Insurance Departments require each company to prepare its own Annual Statement separately and submit it to the Insurance Department. It is required to be filed on an individual basis because it is essentially for the purposes of supervision by the supervising regulatory authority. The primary concern of the regulatory authorities is the protection of the policyholders.

92. Jefferson and Pilot were required to compile the Annual Statement form, and to comply with it and the instructions regarding its completion, and each did so with respect to its Annual Statements for the years 1958 and 1959.

93. Both Jefferson and Pilot were examined in 1961 for the three-year period 1958 through 1960, pursuant to the procedures of the N.A.I.C., by a team of examiners from the insurance departments of various states, including North Carolina. In no respect was the treatment on the Annual Statements for 1958 and 1959 of matters relevant to issues in these cases disapproved or changed by the examination reports resulting from the 1961 examinations.

94. The N.A.I.C. maintains a committee on forms, the purpose of which is to study the form with a view to appropriate revisions from time to time.

## VI

### Unearned Investment Income

95. Upon audit of Jefferson's income tax returns for 1958 and 1959, the Commissioner required that certain amounts of interest and rent actually received by Jefferson, but as yet unearned, should be included in investment income.

96. The Commissioner also required that interest which was not collected when due under the terms of policy loan contracts, but added by Jefferson to the principal of the loan, be included in investment income.

97. The amounts involved herein consist of the following items:

## JEFFERSON STANDARD LIFE INSURANCE COMPANY

| | Description | 1957 | 1958 | 1959 |
|---|---|---|---|---|
| a. | Rents received for rental of premises in years subsequent to year of receipt | $ 20,450 | $ 25,713 | $ 24,536 |
| b. | Interest received on bonds, mortgage loans, and collateral notes for use of money in years subsequent to year of receipt | $146,835 | $149,537 | $181,821 |
| c. | Interest received on premium notes, policy loans, and liens and interest added to policy loan accounts in advance of receipt for use of money in subsequent years | $725,459 | $780,360 | $840,793 |

## PILOT LIFE INSURANCE COMPANY

| | Description | 1957 | 1958 | 1959 |
|---|---|---|---|---|
| a. | Interest received on bonds, mortgage loans, and collateral notes for use of money in years subsequent to year of receipt | $ 47,109 | $ 48,529 | $ 52,078 |
| b. | Interest received on premium notes, policy loans, and liens and interest added to policy loan accounts in advance of receipt for use of money in subsequent years | $ 308 | $ 151 | $ 126 |

98. The interest on policy loans arises when an insured borrows money from the company in connection with a specific life insurance policy and assigns to the company all profits and proceeds then due, or which may thereafter become due, as the sole security for the repayment of the loan and the interest thereon.

99. The advance receipt of interest arose because of the practice of Jefferson and Pilot of collecting a full year's interest on policy loan accounts on their anniversary dates, or by reason of the fact that interest in default was added to the principal of a borrower's loan pursuant to the terms of his contract.

100. The net amount included in gross investment income for the year 1958 by reason of this item was $64,129.00 (consisting of $62,866.00 as to Jefferson, and $1,263.00 as to Pilot) and for the year 1959 was $95,064.00 (consisting of $91,540.00 as to Jefferson, and $3,524.00 as to Pilot).

101. Plaintiff's Exhibit 10 illustrates the manner in which unearned policy loan interest was handled on the records of Jefferson in making the computations necessary for the annual statement, both with respect to interest paid in cash on the anniversary date and with respect to interest unpaid but added to the policyholders' loan account on the anniversary date. Based on a situation where the policy anniversary date was July 1, and a policy loan was made on July 1, 1957, for $1,000.00, and the interest was $56.60, Jefferson deducted the interest of $56.60 in advance from the loan, paying to the policyholder the balance of $943.40. At the end of the year (December 31, 1957), Jefferson made an adjustment on its records reflecting one-half of $56.60 as earned in 1957, and set up the balance as a deferred item to be taken into income in 1958. If the policy loan interest of the same amount was in default, and added on the outstanding loan to the policy loan account, then, as of the end of the year, one-half of the $56.60 was considered as interest earned in that year and the balance was deferred until 1958.

102. The typical policy loan certificate under which interest payments herein referred to arise, provides that "interest shall be payable annually in advance," and "any interest not paid when due shall be added to the principal of the loan and bear interest at the same rate."

103. Both in the case of interest paid in advance by a borrower and interest charged to a policy loan account in advance of receipt, in the event the loan balance was reduced or paid in full during the period to which the interest paid in advance or the unearned interest related, the resulting excess amount of interest was paid to, or credited to the account of, the borrower, or, if the borrower was a deceased policyholder, to the beneficiary under the policy. However, no evidence was presented by Jefferson that it attempted to estimate in advance the refunds to be made, and no evidence was presented of the actual amounts refunded.

104. The record does not disclose the specific reason giving rise to the advance receipt of rents. Presumably, the greater portion is attributable to receipt of a full year's rental in advance, with a portion of the amount attributable to the subsequent calendar year.

105. For the years 1957, 1958, and 1959, Jefferson and Pilot prepared and filed with the State Insurance Commissioner annual statements on forms approved by N.A.I.C. On these annual statements, the portions of rent received in a year for rental of premises during such year were treated as earned income, and the portions of interest received during the year for the use of money during such year, and the portion of interest added to policy loan accounts for the use of money during such year, were treated as earned income, and the remainders of the amounts of rents or interest received during the year, or added to policy loan accounts during the year, exclusive of amounts of earned income of prior years, were deferred as unearned income and reported as income in the subsequent year when earned. These items were re-

quired to be computed and reported on such Annual Statements in this manner.

106. Jefferson treated unearned investment income on its 1958 and 1959 tax returns in the same manner as Jefferson and Pilot treated such items on the Annual Statements approved by N.A.I.C.

107. The issue herein is simply whether the amounts of rent and interest actually received or credited must be included in investment income in the year received or credited, or may they be deferred for tax purposes.

## VII

### Charitable Contributions

108. Jefferson paid charitable contributions amounting to $59,817.59 in 1958 and $68,443.66 in 1959. Pilot paid charitable contributions amounting to $16,-183.34 in 1958 and $16,991.67 in 1959.

109. Jefferson allocated a portion of its contributions to investment expense by applying to the total contributions the ratio of the number of employees in investment functions to total employees. Pilot allocated a portion of its contributions to investment expense by applying to total contributions the ratio of salaries of employees engaged in investment functions to total salaries. These allocations have been accepted for many years by the State insurance departments for purposes of the Annual Statements.

110. A portion of charitable contributions was claimed for Federal tax purposes as an underwriting expense, and a portion as an investment expense. The defendant disallowed only the deduction for charitable contributions as an investment expense, but would permit their deduction in full in the computation of underwriting income.

111. The charitable nature or amount of the contributions is not in issue, nor is the method of allocation used for Annual Statement purposes in dispute.

112. Charitable contributions allocated to investment expense by Jefferson amounted to $20,936.00 for 1958 and $23,955.00 for 1959. Charitable contri-

butions allocated to investment expense by Pilot amounted to $3,275.00 for 1958 and $3,571.00 for 1959.

113. Life insurance companies, including Jefferson and Piot, were required for purposes of the Annual Statement approved by the N.A.I.C., to allocate charitable contributions between investment expense and underwriting expense on a reasonable basis.

114. Of the total amount of charitable contributions paid by Jefferson in 1958, over 93 per cent was paid to organizations in North Carolina and 49 per cent was paid to organizations in the Greensboro area. In 1959, over 95 per cent was paid to organizations in North Carolina and 54 per cent was paid to organizations in the Greensboro area. During 1958 and 1959, Jefferson employed approximately 550 people in Greensboro.

115. Of the total amount of charitable contributions paid by Pilot in 1958, over 94 per cent was paid to organizations in North Carolina, and over 63 per cent was paid to organizations in the Greensboro-High Point area. In 1959, over 93 per cent was paid to organizations in North Carolina and over 67 per cent was paid to organizations in the Greensboro-High Point area. During 1958 and 1959, Pilot employed approximately 500 people in the Greensboro area.

116. The computations of the portion of charitable contributions treated as investment expense in 1958 and 1959 by Jefferson and Pilot were made in a manner consistent with the manner required for the purposes of the Annual Statement approved by N.A.I.C.

## VIII

### Increase in Loading on Deferred and Uncollected Premiums

117. It is a common practice in the life insurance industry to permit policyholders to pay premiums in semi-annual, quarterly, or monthly installments. However, additional charge or interest-type factor is added to the amount of the an-

nual premium when an installment method of paying the premium is elected. Jefferson and Pilot follow this practice.

118. "Deferred premiums" are the fractions of annual premiums, on policies with premiums payable in installments, that become due after December 31 of the calendar year and before the next policy anniversary date.

119. "Uncollected premiums" are annual or installment premiums that, as of December 31 of a calendar year, have become due but which have not been paid.

120. On its Federal income tax returns for 1958 and 1959, in computing gain from operations under Phase II, the taxpayer included in income the gross amount of all premiums, including the gross amount of deferred and uncollected life insurance premiums, and gross amount of accident and health insurance premiums due and unpaid. From these amounts, however, the taxpayer deducted what is referred to as "increase in loading on deferred and uncollected premiums." It is the correctness of this latter deduction which is at issue herein.

121. Under the requirements of State insurance laws, the holder of a life insurance policy has a 31-day grace period after a premium on his life insurance policy has become due, whether the premium is an annual premium or an installment premium, within which to pay the premium and thus maintain his rights under the policy.

122. The contract premium on an insurance policy is considered to be made up of two parts, a net valuation portion and a loading portion.

123. The gross contractual premium, i. e., the amount actually charged the insured, results from an independent judgment of the company of the amount required to provide all benefits under the policy, to cover all expenses, and to provide a profit.

124. Regardless of the company's own estimates, State statutes call for reserves to be maintained based upon a "net valuation premium," i. e., an amount based upon a mortality table and interest rates contained in the statute for the particular policy and its benefits.

125. The difference between the statutory valuation net premium and the gross contractual premium calculated by the company is referred to as the "loading."

126. "Loading" is the excess of the gross premium provided in a life insurance policy contract over the net valuation premium used in determining the reserves for the policy. A purpose of loading is to pay for expenses incurred in writing and caring for insurance policies and annuity contracts, and as a margin for possible contingencies.

127. The loading element of a premium may thus be zero if and when the net valuation premium, i. e., the amount required under State law to be put into reserves for the policy, equals or exceeds the gross contract premium as computed by the company.

128. The reserves attributable to policies having deferred and uncollected premiums are computed by Jefferson on the assumption that the entire deferred or uncollected premiums had been paid. Thus, Jefferson credits reserves for its full year's liability under the policy.

129. The Annual Statements of Jefferson and Pilot submitted to the State Commissioner of Insurance call for the deduction of all actual costs incurred in servicing the policy when such costs are incurred, and such actual costs are deducted accordingly, in addition to the deduction for increases in loading on deferred and uncollected premiums. These actual expenses are deducted as commissions, general expenses, taxes, licenses and fees, etc.

130. Jefferson received deductions in full in computing underwriting income on its Federal income tax returns for 1958 and 1959 for all such expenses paid or incurred in those taxable years.

131. The expenses incident to the writing and servicing of a policy by a life insurance company are greater the first few years of the policy. There is no necessary coincidence in the amount of

the actual expenses and the amount referred to as "loading" for any particular year.

132. With respect to the deduction of loading on deferred and uncollected premiums:

(a) Such deductions in the first year of a policy would result in an additional deduction over and above the deduction for actual costs incurred with regard to the policy which are deducted in full elsewhere;

(b) In the second year of the policy, assuming its terms were not changed and the policyholder continued payments on the same deferred basis, such additional deductions would not be recovered, as the loading at the end of the first year (actually received in the second year) would be equally offset by the deduction for new loading at the end of the second year. The company in the second year would also get a full deduction for actual costs in the second year;

(c) The only point at which the additional deduction would be recovered for tax purposes would be in the last year of the policy, or in the event the terms were changed so as to provide for no more deferred payments;

(d) In the case of a stable or growing company, such overall deductions would not be recovered for tax purposes by the Government until some indefinite time in the future.

133. Policyholders of Jefferson and Pilot had no legal obligation to pay deferred premiums or uncollected premiums on their policies, and could cancel such policies by not paying any more premiums on them.

134. Jefferson and Pilot each complied with the requirements of the Annual Statement approved by N.A.I.C. in the computations they made with respect to deferred and uncollected premiums for 1958 and 1959.

135. The same computations and the same figures were used for Jefferson and Pilot with respect to loading on deferred and uncollected premiums for purposes of the consolidated income tax returns filed for 1958 and 1959 as were used for purposes of the Annual Statements approved by the N.A.I.C. that were filed by the separate companies.

136. The consolidated increase in loading on deferred and uncollected premiums for 1958 was $81,464.00 (consisting of a decrease of $41,348.00 as to Jefferson and an increase of $122,812.00 as to Pilot).

137. The consolidated increase in loading on deferred and uncollected premiums for 1959 was $49,013.00 (consisting of a decrease of $37,748.00 as to Jefferson and an increase of $86,761.00 as to Pilot).

IX

*Deferred and Uncollected Premiums as Assets; Due and Unpaid Premiums as Assets*

138. Following the common practice of the life insurance industry, Jefferson and Pilot sold life insurance policies providing for payment of premiums in installments, resulting in deferred premiums.

139. "Deferred premiums" are those fractions of annual premiums on policies with premiums payable in installments that are payable after December 31 of the calendar year and before the next policy anniversary date.

140. "Uncollected premiums" can be any type of annual, fractional or installment premiums which, as of December 31 of a calendar year, has become due but which has not yet been paid by the policyholders.

141. Jefferson's and Pilot's deferred and uncollected premiums directly resulted from the operations of the companies' insurance trade or business, but did not arise from, and were not connected with, investment operations of the companies.

142. Jefferson and Pilot include in gross premium income as of December 31, the full amount of both deferred and uncollected premiums. A deduction is

then taken for the increase in loading attributable to the deferred and uncollected premiums.

143. In computing its consolidated taxable income on its Federal income tax returns for the years 1958 and 1959, Jefferson did not include as assets any amount of deferred or uncollected premiums.

144. The gross amount of deferred and uncollected premiums at issue in these cases are:

| As of December 31 | Jefferson | Pilot |
| --- | --- | --- |
| 1953 | $10,400,734.00 | $2,771,657.00 |
| 1954 | $10,936,811.00 | $2,975,484.00 |
| 1955 | $11,943,423.00 | $3,341,563.00 |
| 1956 | $12,741,918.00 | $3,890,690.00 |
| 1957 | $13,434,070.00 | $4,173,083.00 |
| 1958 | $13,956,125.00 | $4,460,172.00 |
| 1959 | $14,551,990.00 | $4,800,735.00 |

145. The amount of loading on deferred and uncollected premiums at issue in these cases are:

| As of December 31 | Jefferson | Pilot |
| --- | --- | --- |
| 1953 | $2,962,549.00 | $ 618,370.00 |
| 1954 | $3,105,772.00 | $ 646,612.00 |
| 1955 | $3,341,197.00 | $ 752,693.00 |
| 1956 | $3,584,036.00 | $ 810,975.00 |
| 1957 | $3,787,173.00 | $ 837,249.00 |
| 1958 | $3,766,898.00 | $ 921,973.00 |
| 1959 | $3,735,991.00 | $1,018,762.00 |

146. Life insurance reserves on all policies of Jefferson and Pilot were computed on the assumption that on each policy anniversary a full annual premium had been received. In calculating all such reserves, the full annual net valuation premium was used. This is a customary and usual procedure in the life insurance industry.

147. The reserves attributable to policies having deferred and uncollected premiums were likewise computed on the assumption that the entire deferred or uncollected premium had been paid.

148. Due and unpaid accident and health premiums are premiums on accident and health insurance policies that have become due, but have not been paid by December 31 of the calendar year, and that are in either a grace period provided by law or provided administratively by the insurance company, or are in a reinstatement period.

149. Pilot's due and unpaid accident and health premiums on dates pertinent to the calculation of taxpayer's assets for purposes of these cases were as follows:

| As of December 31 | Pilot |
| --- | --- |
| 1953 | $247,099.00 |
| 1954 | $189,578.00 |
| 1955 | $228,134.00 |
| 1956 | $295,962.00 |
| 1957 | $330,480.00 |
| 1958 | $396,707.00 |
| 1959 | $373,465.00 |

150. Pilot's due and unpaid accident and health premiums on contracts that

were not guaranteed renewable on dates pertinent to the calculation of taxpayer's assets for purposes of these cases were as follows:

| As of December 31 | Pilot |
|---|---|
| 1953 | $247,099.00 |
| 1954 | $189,578.00 |
| 1955 | $228,134.00 |
| 1956 | $295,749.00 |
| 1957 | $330,073.00 |
| 1958 | $396,215.00 |
| 1959 | $372,957.00 |

151. In computing its taxable income for purposes of its 1958 and 1959 Federal income tax returns, Jefferson did not include either the whole or any portion of these premiums or assets.

152. Pilot's treatment of due and unpaid accident and health premiums on its annual statements was not disapproved by the N.A.I.C. examiners in 1961.

## X

### Agents' Debit Balances

153. Agents' debit balances are the result of charges to the accounts of insurance agents made against anticipated future commissions.

154. The practice of making advances to life insurance agents and charging the advances against the agents' anticipated commissions, thereby creating agents' debit balances, is widely recognized and established in the life insurance industry. This practice, however, is not unique to the insurance industry, but rather is a typical method of financing salesmen used by any commercial organization which employs a large number of salesmen.

155. The typical corporation includes such advances as either accounts receivable or prepaid commissions. In either case, for accounting purposes, they are treated as assets. Jefferson, however, did not reflect agents' debit bal-

ances of either Jefferson or Pilot as assets for purposes of Section 805(b) (4), and the Commissioner's determination that they should have been included as assets for such purposes is the subject of this controversy.

156. Jefferson maintained accounts for each of its agents engaged in selling insurance. The principal charges to the accounts of its agents were: (a) chargebacks of commissions previously paid or credited to the agent's account, due to cancellation of the insurance for which the commission had been paid; (b) F.I.C.A. taxes Jefferson was required to withhold from the compensation of full-time life insurance agents; (c) the agents' share of premiums on major medical health insurance and disability income insurance that was obtained by Jefferson for agents as a group; and (d) fees charged agents by Jefferson by reason of the cancellation or nondelivery of insurance policies within a specified time after they were written by the agent.

157. Pilot maintained accounts for each of its general agents, and for each of its agents engaged primarily in the sale of ordinary life insurance. The principal charges to the accounts of agents of Pilot were: (a) money advanced to the agents to provide for their living expenses until their commission income was sufficient to support them, (b) fees charged agents by Pilot by reason of the cancellation or nondelivery of insurance policies within a specified time after they were written by the agent, and (c) charges for premiums on major medical health insurance for dependents of the agents.

158. Jefferson, unlike Pilot, did not make any cash advances to agents during the pertinent years.

159. During the years 1958 and 1959, Jefferson's contracts with its agents called for a 6% interest factor payable by the agents to Jefferson on the amount of the agents' debit balances. However, neither Jefferson nor Pilot made it a

practice of charging agents with interest on debit balances in their accounts.

160. In the case of both Jefferson and Pilot, when an agent terminated his connection with the company at a time when a debit balance existed in his account, commissions to which the agent subsequently became entitled were applied against the debit balances as a matter of practice; however, no attempt was made to collect any remaining debit balance in the account from a former agent.

161. When an agent leaves the employment of either company, leaving a debit balance on his account, and there are no further commissions due to that agent, the company charges the agent's uncollected balances to general insurance expenses.

162. Non-vested commissions which are received after an agent's employment is terminated are not credited to the agent's account and the agent does not receive the money. The company uses the money to offset training and other expenses in recruiting.

163. The large percentage of the debit balances of Pilot's agents represented amounts owed by agents who were still agents of Pilot at the end of the year.

164. The agents' debit balances of Jefferson and Pilot on the following respective dates were in the following respective amounts:

| As of December 31 | Jefferson | Pilot |
|---|---|---|
| 1953 | $1,727.00 | $204,257.00 |
| 1954 | 3,792.00 | 246,920.00 |
| 1955 | 2,373.00 | 297,487.00 |
| 1956 | 2,571.00 | 322,610.00 |
| 1957 | 1,868.00 | 329,553.00 |
| 1958 | 1,758.00 | 233,092.00 |
| 1959 | 2,298.00 | 137,163.00 |

165. The agents had no authority to withdraw any funds from the company by their own action and charge the amounts to their accounts.

166. The Annual Statement approved by N.A.I.C. calls for the amount of agents' debit balances to be shown as a non-admitted asset. The plaintiff's books and records reflect agents' debit balances as ledger assets.

### XI

#### Mortgage Correspondent Escrow Funds

167. In computing its taxable investment income for Federal tax purposes, Pilot did not include the amount of escrow funds held by its mortgage correspondents in assets.

168. The amounts of these escrow funds as of December 31 of the following years were:

| | |
|---|---|
| 1953 | –0– |
| 1954 | –0– |
| 1955 | $57,838.00 |
| 1956 | 12,824.00 |
| 1957 | 8,914.00 |
| 1958 | 19,440.00 |
| 1959 | 12,475.00 |

169. The foregoing amounts were reflected on line 13 of Exhibit 13, found on page 14 of the Annual Statements submitted to the Insurance Department of North Carolina for each of the years 1955 through 1959 as "ledger assets" and as "admitted assets."

170. Pilot's treatment of the mortgage correspondents' escrow funds at is-

sue herein as "admitted assets" for purposes of the Annual Statements was not disapproved by the N.A.I.C. examiners in 1961.

171. The mortgages giving rise to the escrow funds at issue herein were in part FHA mortgages, and others were non-FHA mortgages.

172. As to non-FHA mortgages, Pilot's loan committee generally determine whether an escrow account will be used.

173. Of the total escrow fund involved on December 31, 1955, in the amount of $57,838.00, the amount of $9,807.00 was in Puerto Rico and the amount of $48,031.00 was in banks at or near Arlington, Virginia.

174. Some of the loans made by Pilot in Puerto Rico were secured by FHA mortgages and the remainder by non-FHA mortgages. The escrow account established under the agreement with Banco Credito, a bank in San Juan, Puerto Rico (Pilot's Puerto Rican escrow agent), was used in respect to collections from both FHA and non-FHA mortgages. The categories of items that went into the escrow account were the same in respect to both FHA and non-FHA mortgages, except for the FHA premiums.

175. In the course of handling the mortgages under the agreement with Banco Credito, the escrow funds (being a portion of the periodic payments made by the mortgagors) were received by the bank and placed in trust. The remainder of the payment, consisting of interest and principal, was remitted by the servicer to Pilot once each month.

176. Pilot did not withdraw and place in its own accounts any escrow funds held in trust by the Banco Credito, and did not invest any moneys that were accumulated by the Banco Credito and held for taxes, insurance premiums, and FHA mortgage premiums, or receive any return on such amounts. The Banco Credito was not permitted to invest these escrow funds.

177. Pilot's mortgage loan service contract with the Banco Credito provided: "Either party hereto, without cause, may at its option terminate this agreement upon sixty days" written notice given by the one to the other. "Upon the termination of this agreement, the Servicer shall forthwith deliver to the lender a statement showing all monies collected and not theretofore paid over to lender and a statement of all monies held by it as 'Escrow Funds.' The Servicer shall immediately pay over to the lender all monies so held."

178. On or about May 1, 1946, Pilot entered into a written agreement with C. C. McClaine and others, trading as "McClaine Properties," which is in evidence as Plaintiff's Exhibit 12. Operations under this agreement are pertinent with respect to the year 1955 only. This agreement provided for a servicing arrangement under which McClaine Properties would service mortgages taken by Pilot on properties in certain counties in Virginia.

179. Under the agreement, McClaine Properties was required to deposit promptly in its trust account in a bank acceptable to Pilot all sums collected for Pilot or in connection with loans made in real estate serviced under the agreement.

180. Some of the loans made pursuant to the McClaine Properties agreement were FHA loans; the remainder were not. The escrow deposit under the McClaine Properties agreement was handled in the same general way as the escrow account was handled under the agreement with Banco Credito hereinbefore referred to.

181. The agreement with McClaine Properties had a termination clause similar to the clause in the Banco Credito contract which provided that either party might, at its option and without cause, terminate the agreement, at which time all funds were to be paid to Pilot.

182. McClaine Properties did in fact establish a separate bank account in which it deposited the monies collected

with respect to loans by Pilot during the year 1955.

183. During the year 1955 Pilot did not withdraw any funds deposited under the McClaine Properties agreement from the separate bank account in Virginia.

184. In the main, Pilot serviced its own mortgages without use of mortgage correspondents. The mortgage correspondents' escrow funds here in issue were included, along with the escrow funds on mortgages that Pilot serviced itself, in the liability figures of $491,-642.25 and $447,012.58 as of December 31, 1958, and December 31, 1959, respectively, on line 18, page 3, of the Annual Statement, as liabilities. The same treatment obtained as of December 31, 1955, December 31, 1956, and December 31, 1957.

185. On the asset side of the Annual Statements, page 2, the amounts actually received by Pilot for the payment of taxes, insurance, etc., i. e., escrow funds, are reflected as part of Pilot's own cash and bank deposits in those instances where there is no mortgage correspondent, and as mortgage correspondent escrow funds in those instances where Pilot's contract with its customer calls for a mortgage correspondent.

186. Those escrow funds actually received by Pilot on mortgages Pilot serviced itself were treated by Pilot as assets for purposes of the Annual Statement, and also for purposes of the Federal income tax returns. Only the treatment of the escrow funds held by mortgage correspondents in Puerto Rico and Virginia is at issue herein.

187. With respect to FHA mortgages serviced by Banco Credito and McClaine Properties, Pilot used a deed of trust form, or a form of mortgage containing similar provisions, which provided in part:

"And the said party of the first part, in order more fully to protect the security of this Deed of Trust, does hereby covenant and agree as follows:

"1. That he will promptly pay the principal of and interest on the indebtedness evidenced by the said note, at the times and in the manner therein provided. * * *

"2. That, together with and in addition to the monthly payment of principal and interest payable under the terms of the note secured hereby, he will pay to the holder of the note, on the first day of each month until it is fully paid, the following sums:

"(a) If this Deed of Trust and the note secured hereby are insured under the provisions of the National Housing Act and so long as they continue to be so insured, one-twelfth ($\frac{1}{12}$) of the annual mortgage insurance premium for the purpose of putting the holder thereof in funds with which to discharge the holder's obligation to the Federal Housing Commissioner for mortgage insurance premiums pursuant to the applicable provisions of the National Housing Act, as amended, and Regulations thereunder. The holder of the note shall, on the termination of its obligation to pay mortgage insurance premiums, credit to the account of the party of the first part all payments made under the provisions of this subsection which the holder of the note has not become obligated to pay to the Federal Housing Commissioner.

"(b) A sum equal to the ground rents, if any, next due, plus the premiums that will next become due and payable on policies of fire and other hazard insurance covering the mortgaged property, plus taxes and assessments next due on the mortgaged property (all as estimated by the holder of the note) less all sums already paid therefor divided by the number of months to elapse before one month prior to the date when such ground rents, premiums, taxes, and assessments will become delinquent, such sums to be held by the holder of the note in trust to pay said ground rents, premiums, taxes, and special assessments.

"(c) All payments mentioned in the two preceding subsections of the para-

graph and all payments to be made under the note secured hereby shall be added together and the aggregate amount thereof shall be paid by the party of the first part each month in a single payment to be applied by the holder of the note to the following items in the order set forth:

"(I) premium charges under the contract of insurance with the Federal Housing Commissioner;

"(II) ground rents, taxes, special assessments, fire, and other hazard insurance premiums;

"(III) interest on the note secured hereby; and

"(IV) amortization of the principal of said note."

188. Plaintiff's Exhibit 37 is a deed of trust form customarily used by Pilot in making non-FHA mortgage loans in the State of Virginia which were serviced under the McClaine Properties agreement. The deed of trust contained the following provision:

"And the parties of the first part hereof agree to pay monthly, in addition to the above, a sum equal to the estimated amount of taxes and special assessments next due on the premises covered by this deed of trust less all sums already paid therefor, divided by the number of months to elapse before one month prior to the date when such taxes and/or assessments will become due, such sum to be held by the Pilot Life Insurance Company or its designated agent in trust to pay said taxes and/or special assessments when the same become due, adjustment to be made when actual amount of such taxes and assessments are ascertained."

189. Plaintiff's Exhibit 41 is a mortgage form customarily used by Pilot in making non-FHA loans in Puerto Rico, which was serviced under the Banco Credito agreement. The mortgage contains the following provisions:

"The mortgagors as of this date have subscribed a promissory note in the sum of SIXTEEN THOUSAND DOLLARS ($16,000.00) with interest at the rate of six per cent (6%) per annum until the total satisfaction of the same, payable to Pilot Life Insurance Company, or order, the principal and interest being payable in monthly installments of ONE HUNDRED THIRTY-FIVE DOLLARS AND TWO CENTS ($135.02), and an additional monthly sum of FORTY-ONE DOLLARS AND EIGHTY TWO CENTS ($41.82) as an escrow deposit for the payment of taxes and hazard insurance premiums, making a total monthly payment of ONE HUNDRED SEVENTY-SIX DOLLARS AND EIGHTY-FOUR CENTS ($176.84). * * *"

190. Pilot's treatment of the mortgage correspondents' escrow funds at issue herein as "admitted assets" for purposes of the Annual Statements was not disapproved by the N.A.I.C. examiners in 1961.

191. The foregoing amounts were reflected on line 13 of exhibit 13, found on page 14 of the Annual Statements submitted to the Insurance Department of North Carolina for each of the years 1955 through 1959 as "ledger assets" and as "admitted assets."

192. In computing its taxable investment income for Federal tax purposes, Pilot did not include the amount of escrow funds held by its mortgage correspondents in assets.

## XII

### Nonparticipating Contracts

193. Increases in a life insurance company's reserves are generally attributable to either (1) normal additions made each year to fund the existing and increasing obligations under policies in force; or (2) additions required when a method of assumption used in calculating policy reserves is changed so as to produce a higher reserve. The latter or less usual occurrence is called "reserve strengthening."

194. The dollar amount of the increase in reserve resulting solely from this change in method or assumption is the amount of the reserve strengthening.

195. In the year 1959, plaintiffs strengthened all life reserves, including those attributable to nonparticipating contracts, to net level premium reserves.

196. Nonparticipating contracts are life insurance and annuity contracts in which the policyholders do not participate in company earnings or receive dividends. The nonparticipating contracts pertinent to the issue in this suit are those of the type described in Section 809(d) (5) of the Code, and are referred to hereinafter as nonparticipating contracts.

197. In 1959 the total increase in reserves of Jefferson and Pilot, attributable to such nonparticipating contracts, was $19,620,094.00. Of this amount, $8,081,566.00 resulted from reserve strengthening in 1959 in the reserves attributable to those nonparticipating policies (consisting of $4,057,034.00 as to Jefferson and $4,024,532.00 as to Pilot). The remainder of the $19,620,-094.00 constituted normal reserve increases attributable to nonparticipating contracts.

198. In the consolidated tax return filed for the year 1959, Jefferson, at Schedule E, line 25b, took a deduction of $1,962,009.00 attributable to increases in reserves for nonparticipating contracts.

199. This deduction constituted a full 10% of the total increase in reserves in 1959 (including the increase resulting from the reserve strengthening) attributable to such nonparticipating contracts.

200. The Commissioner adjusted such deduction downward to $1,153,853.00.

201. The difference of $808,156.00 constitutes the deduction taken by Jefferson attributable to reserve strengthening on such nonparticipating contracts. This is a full 10% of the reserve increase of $8,081,566.00 attributable to reserve strengthening for such nonparticipating contracts.

202. The Commissioner held that the portion of the reserve increases on nonparticipating contracts attributable to normal increases in reserves is to be re-flected in the year of the increase, but that the portion of the reserve increases on nonparticipating contracts attributable to reserve strengthening is to be reflected ratably over a ten-year period, starting in the year after the strengthening occurs.

203. Plaintiff's Exhibit 45 illustrates the operation of the nonparticipating contract deduction, and the opposing positions of the parties. This illustration assumes a nonparticipating whole life contract in the amount of $1,000.00 issued in the year 1950 at age 35 with a reserve based upon the 1941 Commissioner's Standard Ordinary Mortality Table with interest at three per cent. Assuming that the December 31, 1958, reserve was calculated according to the Commissioner's Reserve Valuation Method, and that the December 31, 1959, reserve was strengthened by changing the method of calculation to the Net Level Reserve Method, the resulting figures would be as follows:

(a) Under the Commissioner's Reserve Valuation Method, the reserve as of December 31, 1958, would be $134.00, and the reserve as of December 31, 1959, would be $151.00.

(b) Under the Net Level Reserve Method, the reserve as of December 31, 1959, would be $164.00. The excess of the December 31, 1959, reserve over the December 31, 1958, reserve would be $30.00 (i. e., $164.00 less $134.00). Of this increase, $13.00 (i. e., $164.00 less $151.00) arises because the method of valuing the reserves was changed from the Commissioner's Reserve Valuation Method to the Net Level Reserve Method. Under Jefferson's position, the deduction for the increase in nonparticipating reserves for the year 1959 would be based upon an increase in reserves amounting to $30.00. Under the defendant's position, the deduction would be based on an increase of $17.00 (i. e., $30.00 less $13.00). The deduction claimed by Jefferson and calculated from this increase in reserves would be ten per cent of $30.00, or $3.00, in the current year. The defendant claims that the deduction

should be ten per cent of the $17.00 in the current year (i. e., $1.70), and that ten per cent of the balance of the total increase of $13.00, or $1.30, should be taken into account in the computations over the next ten years at the rate of 13 cents in each year.

204. The three per cent of premiums computation provided in Section 809(d) (5) of the Code was not applicable to Jefferson with respect to the year 1959.

## CONCLUSIONS OF LAW

### I

### *General*

1. The Court has jurisdiction of the parties and of the subject matter.

### II

### *The Applicable Rate of Tax*

2. For the years 1958 and 1959, Jefferson was subject to the additional 2 percent tax incident to its privilege of filing consolidated returns.

### III

### *Determination of Consolidated Taxable Income*

■ 3. Intercompany dividends paid by Pilot to Jefferson were not income for purposes of the consolidated income tax returns of the two companies.

■ 4. The intercompany investment of Jefferson in the stock of Pilot was not an asset for purposes of the consolidated income tax returns of the two companies.

■ 5. In the computation of consolidated taxable investment income for purposes of Section 804 for the years 1958 and 1959, intercompany dividends paid by Pilot to Jefferson in such years were properly eliminated from gross investment income in their entirety, and no reduction should be made in the amount of Jefferson's consolidated policy and other contract liability requirements by reason of such elimination.

■ 6. In the computation of consolidated gain from operations for pur-poses of Section 809 for the years 1958 and 1959, intercompany dividends were properly eliminated from gross investment income in their entirety and no reduction should be made in the amount of Jefferson's consolidated required interest for purposes of the computation required by Section 809(a) (1) by reason of such elimination.

7. For the years 1958 and 1959, the consolidating methods and procedures employed by Jefferson in determining taxable investment income, gain from operations, policy and other contract liability requirements, adjusted reserves rates, investment yield and required interest, for purposes of income tax returns, were proper.

### IV

### *Branch Office Managers Supplemental Retirement Plan*

■ 8. The amount set aside by Jefferson for the purpose of future benefits which it might have to pay under its Branch Office Managers Supplemental Retirement Plan did not constitute the life insurance and annuity reserves referred to in Section 801(b) of the Code.

### V

### *Computations for Annual Statement*

9. With respect to the years 1958 and 1959, in making computations required for purposes of the Annual Statement form approved by the N.A.I.C., Jefferson employed an accrual method of accounting.

10. Life insurance companies are specifically authorized by Section 818(a) of the Code to employ an "accrual method of accounting" in computing income tax liability, and to make such computations "consistent with the manner required for purposes of the annual statement approved by the National Association of Insurance Commissioners."

■ 11. The form of the Annual Statement prescribed by the N.A.I.C. may only be used, however, in computing

taxable income when it does not conflict with an accrual method of accounting and is not inconsistent with the provisions of the Internal Revenue Code, or the regulations thereunder.

## VI

### Unearned Investment Income

12. Consistent with the provisions of Section 818(a) of the Code, Jefferson computed its income under an accrual method of accounting.

13. Prepaid investment income, including rents and interest, although unearned, is includable in income when received or credited, and is taxable to an accrual basis taxpayer in the year of receipt. Schlude v. Commissioner of Internal Revenue, 372 U.S. 128, 83 S.Ct. 601, 9 L.Ed.2d 633 (1963).

14. The Commissioner did not abuse his discretion when he disallowed the deferral of unearned investment income in the manner claimed by Jefferson on its 1958 and 1959 tax returns.

## VII

### Charitable Contributions

15. The charitable contributions allocated by Jefferson and Pilot to investment expense in the years 1958 and 1959 were general expenses properly and reasonably assigned to investment expenses.

16. Such contributions were deductions from gross investment income, pursuant to Section 804(c) (1) of the Code, in arriving at investment yield for purposes of determining consolidated taxable investment income.

## VIII

### Increase in Loading on Deferred and Uncollected Premiums

17. Jefferson properly included in income for 1958 and 1959 the gross amount of all premiums, including the gross amount of deferred and uncollected life insurance premiums and the gross amount of accident and health insurance premiums due and unpaid.

18. In making computations entering into the determination of gain from operations, Congress has made no provision for the deduction of increases in loading on deferred and uncollected premiums as an underwriting expense. Items properly deductible in computing gain from operations by life insurance companies are limited to those specified in Section 809(d) of the Code.

19. The Commissioner of Internal Revenue correctly disapproved Jefferson's attempt to deduct from its gross premium income an amount referred to as "increase in loading" on deferred and uncollected premiums.

## IX

### Deferred and Uncollected Premiums as Assets; Due and Unpaid Premiums as Assets

20. Deferred and uncollected premiums of Jefferson and Pilot are assets, other than real and personal property, used in carrying on an insurance trade or business, within the meaning of Section 805(b) (4) of the Code. Treasury Regulations, Section 1.805–5 (a) (4).

21. Due and unpaid accident and health premiums are assets of Pilot, other than real and personal property, used by it in carrying on an insurance trade or business, within the meaning of Section 805(b) (4) of the Code. Treasury Regulations, Section 1.805–5(a) (4).

22. The amount of deferred and uncollected premiums of Jefferson and Pilot, including amounts of loading, and the amount of due and unpaid premiums of Pilot, including amounts of loading, are includable as assets in computing the earning rates of Jefferson and Pilot.

## X

### Agents' Debit Balances

23. The agents' debit balances of Jefferson and Pilot are "assets"

within the meaning of Section 805(b) (4) of the Code.

## XI

### *Mortgage Correspondent Escrow Funds*

24. The term "assets" used in Section 805(b) (4) of the Code embraces only "assets of the company."

25. The mortgage correspondent escrow funds involved in these actions were segregated and held in trust for the benefit of borrowers or mortgagors, and hence were not assets of Pilot for purposes of 805(b) (4) of the Code.

## XII

### *Nonparticipating Contracts*

26. For the year 1959, plaintiff, as provided by Section 809(d) (5) of the Code, is entitled to a deduction relating to nonparticipating contracts in the full amount of the full increase in reserves during the year, including any increase resulting from reserve strengthening. The deduction provided by Section 809(d) (5) is in addition to the deduction provided by Section 809(d) (2) for increases in reserves, and Section 810(d) applies only to Section 809(d) (2).

Any conclusion contained in Conclusions of Law herein, which may properly be construed in whole or in part as a finding of fact, shall be so deemed and treated as if specifically set forth in the Findings of Fact.

Any finding contained in the Findings of Fact herein, which may properly be construed in whole or in part as a conclusion of law, shall be so deemed and treated as if specifically set forth in the Conclusions of Law.

Counsel for the defendant shall prepare and present to the Court, after first having obtained the endorsement of counsel for the plaintiff showing approval as to form, a judgment in conformity herewith. The judgment shall allow necessary adjustments to Jefferson's tax liability for the years 1958 and 1959 on the basis of computations to be made by the parties. In the event the parties are unable to agree upon such computations, and the other terms of a final judgment, within forty days from the date hereof, they shall submit their dispute to the Court.