**LIBERTY NATIONAL LIFE INSUR-
ANCE COMPANY, Plaintiff-Ap-
pellee-Cross Appellant,**

v.

**UNITED STATES of America,
Defendant-Appellant-Cross
Appellee (two cases).**

No. 71–2776.

United States Court of Appeals,
Fifth Circuit.

July 12, 1972.

Scott P. Crampton, Meyer Rothwacks, Asst. Attys. Gen., Hubert M. Doster, Thomas L. Staplton, Attys., Tax Div., Dept. of Justice, Washington, D. C., Wayman G. Sherrer, U. S. Atty., Charles D. Stewart, Asst. U. S. Atty., Birmingham, Ala., for defendant-appellant.

Ira L. Burleson, Theron A. Guthrie, Jr., John W. Gillon, Ralph B. Tate, Frank P. Samford, Jr., Birmingham, Ala., for plaintiff-appellee.

Before RIVES, COLEMAN and DYER, Circuit Judges.

RIVES, Circuit Judge:

We are here asked to tread through the difficult maze of the federal income tax laws which govern life insurance companies. The Government assessed taxpayer, Liberty National Life Insurance Company ("Liberty"), with a deficiency of $80,389.99 for the tax years in question, 1964 and 1965. Liberty filed this suit in federal district court seeking a refund. The issue distills into whether certain escrow mortgage funds are "assets" within the meaning of section 805(b)(4) of the Internal Revenue Code of 1954. Some of the funds in question were commingled by Liberty in its general bank accounts, and some were held for Liberty by correspondent mortgage companies. The district court held that those funds held directly by Liberty are "assets" but that those in the control of the correspondent companies are not. We reverse in part and affirm in part, holding that none of the funds at issue are "assets" of Liberty for purposes of section 805(b)(4).

### I. The Tax Scheme.

This case concerns what is commonly referred to as the Phase I tax levied on life insurance companies. Phase I involves computation of a life insurance company's taxable "investment yield."[1] By the nature of its business a life insurance company is required to maintain a certain level of "reserves." Its reserves are comprised of liquid assets which can readily be converted into cash in order that the company can make good on its insurance contracts. For tax purposes, any investment yield attributable to reserves is not taxed to the company. In effect Congress has recognized that a company's reserves represent its policyholders' share of the company's assets and that the company should not be taxed on income earned by the policyholders' aliquot share of the assets.

In order to determine the company's taxable investment yield it is first necessary to reduce "gross investment income," as defined in section 804(b), by "investment expenses," as defined in section 804(c). Next, the resultant figure, "total investment yield," is pro rated between those assets of the company constituting its reserves and the balance of its assets. That is, taxable investment yield equals total investment yield reduced by that portion of the total yield attributable to reserves. For example, if a company's assets are $1000 of which $250 are reserves and its total investment yield is $100, then the company's taxable investment yield would be computed as follows:

$$\$100 - (100/1000)(\$250) = \$75$$

For sake of clarity we have omitted from the above calculation the fact that the "earnings rate" (i. e., $\frac{\text{total investment yield}}{\text{total assets}}$) is applied not against actual reserves, but against actual reserves reduced by 10% for each 1% by which the actual earnings rate exceeds the earnings rate assumed by the com-

---

1. "Investment yield" is that income which a life insurance company derives from investing its assets.

pany in computing its reserves. Nonetheless, the above example clearly illustrates that a life insurance company's Phase I tax (*i. e.*, its taxable investment yield) increases as its assets increase.

## II. *The Factual Setting.*

Liberty is and was during the tax years in question in the mortgage business, as a conventional mortgagee [2] and as mortgagee on Federal Housing Authority and Veterans Administration loans. Principally it is involved in two types of mortgaging arrangements, direct loans and serviced loans.

### A. *Direct Loans.*

Liberty enters into mortgage contracts directly with the mortgagor. Pursuant to such loans, the mortgagor makes installment loan payments to Liberty, usually at monthly intervals. Part of each payment serves to reduce principal, part is comprised of interest, and the remainder is known as "escrow funds." Escrow funds cover projected yearly property taxes and, in the case of FHA and VA loans, insurance premiums and ground rents.

In holding these escrow funds, Liberty serves as trustee. The monies received are held for the use of the mortgagors. Liberty cannot lawfully disburse these funds for any purpose other than in satisfaction of the trust arrangements. Although it can commingle escrow funds in its general bank accounts,[3] such commingling in no way destroys the trust nature of the funds, nor does commingling impair Liberty's obligation to fulfill its trust agreement. Franklin Life Insurance Co. v. United States, S.D.Ill.1967, 67–2 CCH United States Tax Cases ¶9515, at p. 84,644–45; FHA Reg. § 203.7. In the tax

years in question, Liberty entered into a large number of direct loan contracts. Consequently it held a substantial amount of escrow funds. All such funds were commingled in its general bank accounts. However, at all times Liberty kept accurate records of the amount of escrow funds, and even in tax years not here at issue Liberty always had a bank balance well in excess of the escrow funds on hand (App. at 59). The closing balances on hand at the close of each year were:

| YEAR | ESCROW FUNDS | TAXPAYER FUNDS | TOTAL IN BANK ACCOUNTS |
|---|---|---|---|
| 1959 | $ 967,219.48 | $ 986,114.90 | $1,953,334.38 |
| 1960 | 1,068,342.50 | 935,256.25 | 2,003,598.75 |
| 1961 | 1,111,935.95 | 791,768.09 | 1,903,704.04 |
| 1962 | 1,127,260.90 | 847,386.03 | 1,974,646.93 |
| 1963 | 1,172,879.96 | 1,256,166.01 | 2,429,045.97 |
| 1964 | 1,178,459.20 | 720,602.93 | 1,899,062.13 |
| 1965 | 1,137,191.00 | 1,011,072.42 | 2,148,263.42 |

Moreover, there was no evidence, suggestion, or hint that Liberty ever misappropriated any escrow funds.

### B. *Serviced Loans.*

In other instances Liberty assumed the status of mortgagee by contracting with correspondent mortgagees, either before or after closing of the loans. In all such cases, the correspondent mortgagees took receipt of the monthly payments made by the mortgagors. Again each payment was partially comprised of escrow funds. After deducting its own service fee a correspondent mortgagee would remit to Liberty that portion of the mortgage payment constituting principal and interest. The correspondent mortgagee would itself deposit the escrow funds in a special bank account. Each account was designated to show the trust nature of the funds therein. That is, the correspondent mortgagees

---

2. That is, Liberty entered into ordinary mortgage agreements with individual applicants.

3. Although as a general principle a trustee does not commingle trust funds with his own funds, that is not the practice in this type of situation. Nor does the Government contend otherwise. See FHA Reg. § 203.4. Moreover when a trustee withdraws funds from a commingled account

it is presumed that he has used his own funds rather than a portion of his funds and a portion of the trustor's. 90 C.J.S. Trusts § 438(c). Equity impresses a trust on the commingled account to preserve the trustor's interest. See Central National Bank v. Connecticut Mutual Life Ins. Co., 1851, 104 U.S. 54, 26 L.Ed. 693; Surgi v. First National Bank & Trust Co., 5 Cir. 1942, 125 F.2d 425.

were not permitted to commingle such funds in their own bank accounts. Though pursuant to its contracts with the correspondent mortgagees Liberty had the power and right to demand payment over of all escrow funds, it did not do so in either of the tax years at issue, nor did it do so in any other year.[4]

### III. *The Law.*

██ We discern from the statutory scheme a congressional intent that taxable investment yield be derived only from those assets of a life insurance company which are available to be, even though not actually, invested.

Section 805(b)(4) defines "assets" as follows:

"[T]he term 'assets' means all assets of the company (including nonadmitted assets), other than real and personal property (excluding money) used by it in carrying on an insurance trade or business. * * *"

Our notion of the purpose and intendment of that provision is supported by plain reason. *See* Franklin Life Insurance Co., *supra*; Jefferson Standard Life Insurance Co. v. United States, M. D.N.C.1967, 272 F.Supp. 97. With respect both to the escrow funds held by Liberty and to those under dominion of the correspondents, it can be said, as the Tax Court has said in construing section 805(b)(4):

"They do not currently yield any income. They cannot and are not used to produce investment income; and * * * should not be included in the

formula used to determine the rate of return on the company's investment assets."

Western National Life Insurance Co., 1968, 50 T.C. 285, 298, modified, 1969, 51 T.C. 824,[5] rev'd on other grounds, 5 Cir. 1970, 432 F.2d 298. We are in accord with that philosophy. Moreover, in providing that taxable investment income does not include yield attributable to reserves, Congress manifested its intent to tax life insurance companies only on that portion of its yield derived from its own assets. For even though reserves are appropriate for investment purposes they are not, as section 805(b)(4) itself requires, "assets of the company." Rather, reserves represent the policyholders' share of the company. Because of the trust imposed on all of the escrow funds here at issue, they were not assets of the company, even those in the hands of Liberty. Liberty could not use the funds in satisfaction of its own obligations but only to carry out the terms of the trust agreements. Nor could Liberty invest the funds and retain any investment income so derived.[6] To say that section 805(b)(4) encompasses only assets of the company is but another way of saying that to be deemed an asset an item must be both available for and capable of investment. It is in furtherance of this philosophy that Congress, in section 804(b)(4), specifically excluded from the term "assets" real and personal property used in carrying on the insurance trade or business. Put shortly, such property is neither available for nor capable of investment.

---

4. The Record shows that Liberty would only require a correspondent mortgagee to pay over its escrow funds in the event that the correspondent misappropriated some of the funds. And even if Liberty took possession of the escrow funds, it would not use them for any purpose other than to fulfill the obligations of the trust.

5. Though the holding of *Western National* was subsequently modified on rehearing, the logic of the above-quoted rationale is nonetheless compelling.

6. The obligation to pay over such interest inures as a general principle of law. In

this vein the Department of Housing and Urban Development has said, with respect to FHA loans:

"[W]henever a mortgagee invests escrow funds in interest-bearing accounts the interest must accrue to the benefit of the mortgagor rather than to the benefit of the mortgagee. It is FHA's position that a mortgagee who deposited escrow funds in an account bearing interest for the benefit of the mortgagee would be in violation of FHA regulations."

---

The district court held that only those escrow funds held by Liberty were assets. Apparently it agreed with our rationale—that to constitute assets the escrow funds must be capable of and available for investment—insofar as the escrow funds in the hands of the correspondents were concerned. And even with respect to the funds held by Liberty the district court seemingly recognized the validity of the above approach, but on the facts of this case held the funds to be assets because "even though you have assets that could not produce investments, they may in a sense free other items to produce investment return." (App. at 93.) The district court found that the commingled funds did serve to free other assets.[7]

Having perused the record sedulously, we find no evidence in support of that finding. At all times Liberty had substantial funds in excess of the amount in escrow. The Government accepts that fact and so did the district court. There was no indication that Liberty ever permitted its working capital to fall below a normal level in reliance on the fact that it had the escrow funds in its general bank accounts. We are bound to presume that Liberty acted in good faith and that it did not misappropriate trust funds. In fact the district court recognized that Liberty had always exercised good faith. Unless it could be shown that the escrow funds actually were used for investment or that they had indirectly served to permit Liberty to invest more assets than it ordinarily could, we cannot see how it can be said that the escrow funds were assets of the company. In our view the only type of benefit which Liberty might receive from the escrow funds, which in turn would result in our holding that the funds were assets within the meaning of section 805(b)(4), would be the freeing up of other assets for investment. Because we find no evidence indicating that such benefit inured to Liberty, we hold the district court's contrary finding to be clearly erroneous.

The Government contends that to exclude escrow funds from the definition of "assets" is inconsistent with the cases holding that deferred but uncollected and due but unpaid premiums are assets.[8] One such case, *Western National*, 50 T.C. supra, reasoned that such items were not assets, being incapable of investment. See note 5, *supra*, and accompanying text. Though that holding was abandoned (51 T.C. 824), the underlying reasoning was not. *See* Western National Life Insurance Co. v. Commissioner of Internal Revenue, 5 Cir. 1970, 432 F.2d 298; Franklin Life Ins. Co., *supra*; Jefferson Standard Life Ins. Co. v. United States, 4 Cir. 1969, 408 F.2d 842. In calculating the amount of reserves, a life insurance company must include deferred but uncollected and due but unpaid premiums. If in computing the Phase I tax such items were not included in "assets," the result would be to overstate the amount of yield attributable to reserves.[9] Consequently, even though theoretically speaking due but

7. Said the district court:
   "However, in this case, the company was permitted though it held a special relationship regarding these funds to comingle [sic] them, to in effect take a benefit of a sort from them. And I find that there was a benefit that the company had from having these funds available. It had the effect of freeing other assets to be invested." (App. at 91.)

8. Yet two courts have, in the same breath, excluded escrow funds from "assets" while including such uncollected and unpaid premiums. Franklin Life Ins. Co., *supra*; Jefferson Standard Life Ins. Co. v. United States, *supra*.

9. Assume assets were $1000, of which $50 was due but unpaid premiums. Assume further that reserves were $250 and that in computing reserves, the company took into account the $50 in due but unpaid premiums. Finally assume that total investment yield was $100. The company's taxable investment yield would properly be computed as follows:

   $100 - 100‰/1000 ($250) = $75

   However, if due but unpaid premiums were excluded from assets, the amount of taxable investment yield would be distorted:

   $100 - 100‰/950 ($250) = $73.68.

unpaid and deferred but uncollected premiums are not "assets," they must be included as such to preserve the integrity of the Phase I computations. In this case, excluding all the escrow funds at issue from assets does not serve to misstate taxable investment yield.

In sum, no taxable income can be attributed to the escrow funds, even those held by Liberty, since they were not available for investment. Like Liberty's reserves, the escrow funds belonged to someone else.

■ Costs are taxed against the United States. See 28 U.S.C. § 2412; Rules of Appellate Procedure 39(a) and (b).

Affirmed in part, reversed in part.