**BANKERS UNION LIFE INSURANCE CO., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT**

Docket Nos. 5807–71, 442–73.   Filed August 21, 1974.

*Duane F. Wurzer*, for the petitioner.
*Arthur B. Bleecher*, for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioner's Federal income taxes as follows:

| Year | Deficiency | Year | Deficiency |
|------|-----------|------|-----------|
| 1965 | $56,276.00 | 1967 | $81,323.00 |
| 1966 | 19,452.00 | 1968 | 26,876.50 |

One issue [1] has been conceded by respondent; those remaining for decision, which mostly concern Code sections added by the Life Insurance Company Income Tax Act of 1959, 73 Stat. 112, are as follows: (1) Whether petitioner must include net deferred premiums and "loading" thereon in (a) "assets" under section 805(b)(4), I.R.C. 1954,[2] and (b) "gross premium income" under section 809(c)(1); (2) whether petitioner must include mortgage escrow funds in assets under section 805(b)(4); (3) whether petitioner must include interest on mortgage loans in foreclosure and on mortgage loans on which interest is more than 90 days past due in section 805(b)(4) assets and in "gross investment income" under section 804(b)(1); (4) whether petitioner must include unearned interest on policy loans in section 804(b)(1) gross investment income; and (5) whether petitioner is entitled to deduct legal fees paid in connection with the liquidation of a wholly owned subsidiary acquired in 1965.

### FINDINGS OF FACT

Some facts have been stipulated and are so found.

Petitioner is a life insurance company incorporated and organized under the insurance laws of the State of Colorado, with its home office and principal place of business in Denver, Colo. At all material times, petitioner was engaged in business as a life insurance company within the meaning of the Internal Revenue Code of 1954.

Petitioner made timely filings of its Federal income tax returns for the taxable years 1965 through 1967 with the district director of internal revenue at Denver, Colo. Petitioner timely filed its 1968 Federal income tax return with the Internal Revenue Service Center in Austin, Tex.

The National Association of Insurance Commissioners (hereinafter NAIC) is a voluntary organization of insurance commissioners of various States who are charged with supervising insurance companies and their operations. The NAIC has adopted a uniform financial statement form for use by insurance companies in filing their annual statements with State insurance commissioners. Petitioner prepared its annual statements for the years 1965 through 1968 on the form approved by the NAIC and on the basis of NAIC requirements.

Petitioner keeps cash receipts and disbursements records, as required by Colorado insurance laws, in addition to accrual records. In each year at bar petitioner was required to, and did, file a duplicate of its

---

[1] Concerning whether petitioner's acquisition in 1965 of all of the outstanding capital stock of another life insurance company constituted a "purchase" within the meaning of sec. 334(b)(3).

[2] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.

NAIC annual statement for that year with its Federal income tax return. The NAIC annual statements are prepared on a hybrid system in which petitioner must report its cash receipts and disbursements, which are then converted to a modified accrual basis, and are used for examination and audit by State insurance departments.

Certain terms common to the life insurance industry have the following meanings. *Gross annual premium:* The amount of consideration paid by the insured for coverage for a policy year which is 12 months from the date of issuance of the policy and each anniversary thereof; the amount stated in the life insurance contract as the amount due on an annual basis to keep the contract in force, consisting of a "net valuation premium" plus "loading." *Net annual valuation premium:* The amount required each year to provide the policy benefits for the current year and to establish the reserve for the payment of future benefits; this determination involves mortality and interest assumptions which are assumed for the policy or regulated by State law and represents the pure cost of providing life insurance benefits. *Loading:* The difference between the gross annual premium and the net annual valuation premium; the amount added to the pure cost of providing insurance benefits to cover the additional cost of estimated administration, management, and operating expenses, as well as contingencies and profits. *Deferred and uncollected premiums:* Premiums on policies with premiums payable more often than annually which become due after December 31 of the calendar year and before the next policy anniversary date. The term refers to premium coverage for a period of time after December 31 of each year; for purposes of simplicity, this term includes "due and unpaid premiums" which were due on or before the end of the taxable years but were not then paid to the company. In such cases, the insurance nonetheless remains in force because of a grace period for payment of premiums provided in the policies. *Net premiums deferred and uncollected:* The amount of deferred and uncollected premiums exclusive of loading.

Petitioner does not have a legal right to collect premiums when they become due on its policies since premiums which have not actually been paid to petitioner are not contractually due from its policyholders. Payment of premiums is at the sole election of an insured, who may decide to keep his policy in force by paying premiums as they fall due or elect to abandon or otherwise permit his policy to lapse by nonpayment of premiums.

Petitioner has no legal right to collect deferred and uncollected premiums. Such premiums are not cash receipts. They cannot be invested, and they produce no income, until actually paid. As of any December 31, all events have not occurred which would fix the right to collect deferred and uncollected premiums in the following year.

Petitioner pays no investment expenses out of loading. Loading concerns only the writing of insurance and the conduct of the business of underwriting insurance. It is expected to cover agents' commissions and insurance operating expenses and to provide, if possible, an underwriting profit.

Under State laws and NAIC requirements, an insurance company is obligated to establish and maintain reserves for its potential liability for all policies in force. The reserve is calculated, as a computational technique, as though all premiums had been paid in full 1 year in advance on each anniversary date commencing with the issuance date of the policy, even though premiums are not usually paid in this manner.

The NAIC requires an insurance company, in preparing its annual statements, to show under assets an amount equal to that which the company expects to receive if all net premiums deferred and uncollected at the end of the year are in fact paid; loading expected to be received on those premiums is not required to be shown. This "asset," as an accounting matter, offsets the reserve liability attributable to deferred and uncollected premiums substantially in an equal amount. As required by the NAIC through its annual statement form, petitioner's annual statements for the years at bar included net premiums deferred and uncollected as an asset but did not so include loading on such premiums. In those annual statements, net premiums deferred and uncollected are listed as nonledger admitted assets, opposite the caption "Life insurance premiums and annuity considerations deferred and uncollected." Loading on net premiums deferred and uncollected was also reflected in petitioner's annual statements for the years at bar but was not listed as an asset.

On its Federal income tax returns for the years at issue, petitioner included net premiums deferred and uncollected as an asset and as a reserve. On those returns, petitioner did not include loading on such premiums either as an asset or as a reserve.

Net premiums deferred and uncollected were shown as assets under section 805 (b) (4) on petitioner's returns as follows:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1965 | $217, 366 | 1967 | $297, 382 |
| 1966 | 313, 559 | 1968 | 330, 284 |

Petitioner's returns did not include loading on net premiums deferred and uncollected as an asset under section 805 (b) (4) in the following amounts:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1965 | $95, 972 | 1967 | $160, 768 |
| 1966 | 143, 137 | 1968 | 167, 864 |

On its Federal income tax returns for the years in issue, petitioner did not include in premium income under section 809(c)(1) the following amounts for increases in loading on deferred and uncollected premiums:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1965 | $15,145 | 1967 | $17,631 |
| 1966 | 10,043 | 1968 | 7,696 |

Such increases were reflected in petitioner's annual statements in a table headed "Analysis of Operations by Lines of Business," opposite the caption "Increase in loading on and cost of collection in excess of loading on deferred and uncollected premiums."

On its Federal income tax returns for the years at bar petitioner did include in premium income under section 809(c)(1) the increase or decrease in the total net amount of uncollected premiums as follows:

| Year | Gross amount | Less loading | Net amount |
|------|-------------|-------------|------------|
| 1965 | $20,373 | $15,145 | $5,228 |
| 1966 | 143,357 | 10,043 | 133,314 |
| 1967 | 1,454 | 17,631 | (16,177) |
| 1968 | 40,598 | 7,696 | 32,902 |

Part of petitioner's business is the making of mortgage loans. Each payment received by petitioner from certain borrowers on their respective mortgage loans includes a sum for real estate taxes and insurance on the mortgaged property which is accumulated periodically and thereafter paid out by petitioner when the real estate taxes and insurance premiums are due. These sums, together with minor amounts of withholding taxes, are referred to as petitioner's mortgage escrow funds.

Such escrow funds are received by petitioner from its borrowers pursuant to the terms of their respective mortgage loans and deeds of trust which provide that such funds shall be held by petitioner in trust to pay such taxes and insurance premiums as they fall due. Such escrow funds are reflected in the NAIC-approved annual statements as a liability on the balance sheet; the funds do not per se appear as an asset on the balance sheet, but the cash or other asset into which such funds had been commingled would so appear.

On its Federal income tax return for 1965, petitioner did not include its mortgage escrow funds as an asset under section 805(b)(4) in the amount of $212,854. On its Federal income tax returns for 1966, 1967, and 1968, petitioner did so include such escrow funds as assets in the following amounts:

| Year | Amount |
|------|--------|
| 1966 | $212,128 |
| 1967 | 193,769 |
| 1968 | 173,515 |

The escrow funds were reflected in petitioner's annual statements for the years at issue as liabilities opposite the caption "Amounts withheld or retained by company as agent or trustee."

Petitioner, during the years at bar, maintained records clearly reflecting the escrow balance of each of its borrowers who were required to make escrow payments for taxes and insurance and maintained bank accounts far in excess of the amount of escrow funds held by it. The amounts of escrow funds and the cash and bank deposits of petitioner were as follows:

| Year | Escrow funds | Cash and bank deposits |
|---|---|---|
| 1965 | $212, 854 | $3, 283, 050 |
| 1966 | 212, 128 | 3, 102, 006 |
| 1967 | 193, 769 | 1, 849, 973 |
| 1968 | 173, 515 | 2, 172, 072 |

The cash and bank deposits were reflected in petitioner's annual statements as assets opposite the caption "Cash and bank deposits." Petitioner maintained its cash and bank deposits in both noninterest-paying bank accounts and in interest-paying certificates of deposit in the following amounts in the years at issue:

| Year | Non-interest-paying | Interest-paying | Total |
|---|---|---|---|
| 1965 | $1, 183, 050 | $2, 100, 000 | $3, 283, 050 |
| 1966 | 1, 772, 006 | 1, 330, 000 | 3, 102, 006 |
| 1967 | 1, 337, 473 | 512, 500 | 1, 849, 973 |
| 1968 | 1, 602, 072 | 570, 000 | 2, 172, 072 |

The amounts above were as of December 31 of each year and would fluctuate from day to day throughout the year.

Petitioner was not required by law to keep its mortgage escrow funds in separate bank accounts, but was permitted to, and did, commingle the funds in its general bank accounts.

On its Federal income tax returns for 1967 and 1968, petitioner did not include interest on certain mortgage loans on which interest was more than 90 days overdue as an asset under section 805 (b) (4) in the following amounts:

| | |
|---|---|
| 1967 | $33, 539 |
| 1968 | 51, 550 |

These items were reflected in petitioner's annual statements for those years as nonadmitted items of gross investment income and as nonadmitted assets. Separate schedules in those annual statements show that the following represented the total amounts of interest due and unpaid on mortgages not in foreclosure owned by petitioner at the end

of each taxable year on which interest was overdue more than 3 months:

| | |
|---|---|
| 1967 | $47,990.86 |
| 1968 | 67,620.18 |

On the same returns, petitioner did not include interest on certain mortgage loans 90 days past due as gross investment income under section 804(b)(1) in the following amounts:

| | |
|---|---|
| 1967 | $33,539 |
| 1968 | 18,011 |

In 1967, $32,924 of the interest on mortgage loans on which interest was 90 days past due was attributable to loans secured by real estate which was subsequently bid in by petitioner at foreclosure in 1969 for the principal amount due on the loans. Petitions for deficiency judgments relating to these loans were filed in the appropriate court. To date of the trial in the case now at bar, the parties stipulate that none of the interest in question had been collected. However, the petitions for deficiency judgments stated that the alleged debtors would be given credit for the amounts at which the properties in question were bid in by petitioner, to be applied first to attorney's fees due in connection with the loans, then to accrued interest, and only then to the remaining principal of the loans. The petitions prayed payment only of the amount of principal which would remain due, plus interest accruing after the date of the foreclosure sale, after the crediting scheme above. That amount of principal was in each case greater than the amount at which the petitions state that each property was bid in by petitioner. The petitions also stated that before the foreclosure sales of the two properties involved, each property had been appraised at a value equal to the original principal amount of the mortgage loan for which it had been pledged as security.

In 1968, $14,553 of the mortgage loan interest 90 days past due was attributable to an item of real estate regarding which no interest was collected in 1968 or any subsequent year.

On its Federal income tax return for 1968, petitioner did not include interest on certain mortgage loans in the process of foreclosure in the amount of $109,518, either as an asset under section 805(b)(4) or as an item of gross investment income under section 804(b)(1). The amount of $109,518 was attributable to loans secured by real estate which was subsequently bid in by petitioner at foreclosure in 1969 for the principal amount due on the loans, and up to the date of trial in the case at bar, the parties have stipulated that none of the $109,518 has been collected. The amount of $109,518 is reflected in a schedule in petitioner's annual statement for 1968 showing all mortgages in the

process of foreclosure owned by petitioner at the end of the taxable year, under the caption "Interest Due and Unpaid." Nothing in that schedule indicates that such interest was a nonadmitted asset; however, the item appeared nowhere else in the statement.

Policies issued by petitioner which have cash values provide that a loan may be obtained on the sole security of the policy at any time that a cash value is available and while the policy is in force. Interest on policy loans is booked in advance at the time the loan is made to the end of the current policy year and annually thereafter on the policy anniversary for the ensuing year, in advance. Actual prepayment of interest is not usually made; instead, unearned interest is added to the loan balance with a credit to interest income for the unearned interest. If the interest on the policy loan is not paid when due, it is added to the principal of the existing loan and thereafter bears interest at the same rate, beginning with the next policy year.

The insured has the right to repay a policy loan at any time, and if he does so, will receive a refund or credit for the unearned interest, with petitioner retaining only the exact amount of interest ratably earned. If the policyholder should surrender his policy for the cash value, then only the exact amount of interest ratably earned by petitioner is retained by it and the residue is returned to the policyholder. If the policyholder should die, then only the exact amount of interest ratably earned by petitioner is retained by it and the residue is paid to the beneficiary of the policy, along with the death benefit, less the policy loan.

The method of determining what portion of the interest belongs to petitioner as earned interest at the end of the calendar year and the portion which is unearned interest, is determined in accordance with established accounting principles. The amount of unearned interest at the end of the year which may become earned by petitioner in the subsequent year is undeterminable as to an individual policyholder and is dependent upon whether the insured continues to live and whether he elects to repay the loan or surrender the policy for its cash value.

Unearned interest on policy loans has no effect on policyholders' reserves and does not make available to petitioner any additional funds for investment, unless prepaid in cash.

On its Federal income tax returns for the years in issue, petitioner did not include unearned interest on policy loans in income under section 804(b)(1) in the following amounts:

| 1965 | $2,927 | 1967 | $299 |
| 1966 | 7,782 | 1968 | 5,294 |

The parties have stipulated, for purposes of the present inquiry, that one-third of the above sums was actually prepaid in cash by the

insureds and that two-thirds were not collected but were merely entered on petitioner's books, as *supra.*

For the taxable year 1965, respondent included the increase in unearned interest on policy loans from January 1, 1954, to December 31, 1964, in petitioner's income under section 804(b)(1) in the total amount of $48,032, applying section 481, relating to adjustments required by changes in method of accounting.

The unearned interest on policy loans is computed as of each December 31. The effect on income for such year depends on the increase or decrease in such account from year to year.

On its Federal income tax returns for the years in issue, petitioner reported total gross investment interest income under section 804 (b)(1) in the following amounts:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1965 | $1,224,055 | 1967 | $1,306,009 |
| 1966 | 1,319,693 | 1968 | 1,187,203 |

In late 1965, petitioner acquired for $2,400,000 all of the outstanding stock of American Benefit Life Insurance Co. (hereinafter ABL), a life insurance company duly organized under the laws of Louisiana. Petitioner subsequently liquidated ABL, took over the latter's assets and insurance policies, and conducted the latter's business itself.

Petitioner treated the acquisition of ABL's stock and the subsequent liquidation as a purchase of ABL's assets. It thus treated the $2,400,000 purchase price of the stock as its basis in the underlying assets and claimed amortization deductions therefor as follows:

| Year | Amount |
|------|--------|
| 1966 | $73,590 |
| 1967 | 176,616 |
| 1968 | 176,616 |

Respondent conceded petitioner's reporting of the transaction in his reply brief.

During 1967 petitioner paid $5,991.25 to the law firm of Sehrt, Boyle & Wheeler, of New Orleans, La., for legal services in connection with the transfer of the assets and insurance policies of ABL to petitioner. Respondent does not now contest that petitioner was entitled to amortize that legal fee in the same proportionate amounts as it did the purchase price of the ABL stock, but denies petitioner's right to deduct the entire amount of the fees as ordinary and necessary business expense in 1967.

### OPINION

We are again faced with the task of determining whether certain deferred and/or uncollected items of potential income to an insurance company must be included in the computation of the company's taxa-

ble income under the Life Insurance Company Income Tax Act of 1959, *supra*. Consideration has been given to some of the issues here involved in two prior cases decided by this Court; see *Western National Life Insurance Co. of Texas*, 50 T.C. 285 (1968), modified 51 T.C. 824 (1969), revd. 432 F. 2d 298 (C.A. 5, 1970); *Western & Southern Life Insurance Co.*, 55 T.C. 1036 (1971), revd. 460 F. 2d 8 (C.A. 6, 1972). Consideration has also been given to those same issues and several others here involved by four Courts of Appeals, the Fourth Circuit in *Jefferson Standard Life Insurance Co.* v. *United States*, 408 F. 2d 842 (C.A. 4, 1969); the Fifth Circuit in reversing this Court in *Western National Life Insurance Co.*, *supra*, and in *Liberty National Life Insurance Co.* v. *United States*, 463 F. 2d 1027 (C.A. 5, 1972), and *Great Commonwealth Life Insurance Co.* v. *United States*, 491 F. 2d 109 (C.A. 5, 1974); the Sixth Circuit in reversing this Court in *Western & Southern Life Insurance Co.* v. *United States, supra;* and the Seventh Circuit in *Franklin Life Insurance Co.* v. *United States*, 399 F. 2d 757 (C.A. 7, 1968).

The provisions of the 1959 Act, which are contained in subchapter L, part I, sections 801–820, I.R.C. 1954, have been discussed at length in most of the opinions in the above cases, and we see no need to repeat them in detail in this opinion. They may be briefly summarized as follows.

Computation of life insurance company taxable income is made under a three-phase approach outlined by section 802(b). The first phase is based on a company's investment income, the second on the excess of underwriting (operating) income over investment income, and the third on the amounts subtracted from the policyholder's surplus account for the taxable year. We will be concerned here with only phases I and II.

Under sections 804 and 805, an insurance company's taxable investment income is determined by effecting a division of each item of investment yield, tax-exempt or not, between the company and its policyholder reserves. This reflects a recognition "that life insurance companies are legally obligated to keep policyholder reserves in order to meet future claims, that they normally add a significant portion of their investment income to these reserves, and that these annual reserve increments should not be subjected to tax. *United States* v. *Atlas Ins. Co.*, 381 U.S. 233, 235–236 (1965)." *Western & Southern Life Insurance Co.*, *supra* at 1040. Under section 802(b)(2), phase II of the computation of a life insurance company's taxable income is based on a company's gain from operations. Gain from operations is defined in section 809(b)(1) as the amount by which the sum of the items specified therein exceeds the deductions provided by subsection (d).

Under section 809(c)(1) there shall be taken into account for this purpose "The gross amount of premiums and other consideration (including advanced premiums, deposits, * * *) on insurance and annuity contracts." The deductions which are allowed in computing gain from operations are set forth in subsection (d), including such items as claims and benefits accrued, and losses incurred, during the taxable year on insurance and annuity contracts, the net increase in reserves which is required to be taken into account, the dividends paid to policyholders, etc.

Under sections 804 and 805 (phase I), the policyholder's share of an item of investment yield is determined largely by applying to the investment yield a fraction, the numerator of which represents life insurance reserves as defined by section 801(b), and the denominator of which is composed of the "assets" of the company, defined by section 805(b)(4). Section 805(b)(4) defines "assets" as "all assets of the company (including nonadmitted assets), other than real and personal property (excluding money) used by it in carrying on an insurance trade or business." Since the objective of these Code provisions is to determine the amount of the policyholder's share of investment yield, which is nontaxable to the insurance company, it is obvious that the larger the amount of the assets used as a denominator in the above fraction, the smaller the fraction, and less of the company's investment yield will be excluded from tax; to the extent such amounts are excluded from assets, more of the investment yield will go untaxed. Under phase II, of course, the larger the amount of the premiums that are included in gain from operations, which are not offset by an allowable deduction, the larger the insurance company's gain from operations and the larger the amount of its phase II tax.

The principal issues with which we are concerned here are whether deferred and uncollected premiums, including premiums due and unpaid, and the loading thereon, all of which terms have been defined in our findings of fact and in the various court opinions above mentioned, must be included in assets in the phase I computation and in gross premiums in the phase II computation. Section 818(a) requires generally that computation of a life insurance company's income taxes be made under an accrual accounting method. There is no dispute that under normal accrual accounting concepts neither net premiums deferred and uncollected nor loading thereon would be includable as assets or as operating income because they are not received by the end of the taxable year, and no right then exists to collect them. See *Western & Southern Life Insurance Co.*, 460 F. 2d at 10–14; *Western National Life Insurance Co. of Texas*, 51 T.C. at 828–829.

### 1. *Deferred and Uncollected Premiums and Loading Thereon*

The principal cause of the problem with regard to deferred and uncollected premiums is the fact that State insurance departments and the National Association of Insurance Commissioners Convention forms, which insurance companies are required to file, require that the yearend reserve on each life insurance policy be computed on the assumption that the entire premium for the current policy year has been collected a year in advance. Of course, this assumption is not in accord with the facts; many premiums are paid on a quarterly or other deferred basis throughout the policy year, which extends beyond the end of the taxable year. The policyholder has no obligation to pay these premiums; he can discontinue the policy at any time without liability for any premiums not paid. But since the insurance company is required to credit its reserves at the end of the taxable year with the entire annual net valuation premiums, whether collected or not, the reserve liability becomes overstated. The reserve liability affects both the phase I and phase II tax computations because it is included in the numerator of the fraction used in determining the policyholder's share of investment income and the annual increase in such reserves is allowed as a deduction in determining gain from operations.

As mentioned before, these are not issues of first impression in this Court. *Western National Life Insurance Co. of Texas*, *supra*, involved only the phase I, or investment income, tax. In our first opinion in that case we held that neither the deferred and uncollected premiums, nor the loading thereon, were includable as assets for purposes of computing the phase I tax, thus lowering the company's taxable investment income. Upon reconsideration, in the light of the opinion of the Seventh Circuit in *Franklin Life Insurance Co.* v. *United States*, *supra*, and the amicus brief filed by the American Life Convention and the Life Insurance Association of America, we modified our conclusion to hold (51 T.C. 824) that the net deferred and uncollected premiums are includable in assets in the phase I computation but that the "loading" added to the premiums was not includable.

Several years later, in *Western & Southern Life Insurance Co.*, *supra*, we had before us both the phase I and phase II taxes, but the taxpayer did not contest the inclusion of *net* deferred and uncollected premiums (exclusive of loading) either in assets for the phase I computation or in gross premiums for the phase II computations. Thus, the issues involved only the loading factor. Despite the fact that three appellate courts had by that time concluded to the contrary, we again held that "loading" on deferred and uncollected premiums was not includable in the computation of either the phase I or phase II tax.

Our conclusions in both of the above cases were based primarily on the philosophy that insurance companies are required to account on the

accrual method; that deferred and uncollected premiums would not normally be includable in the computations under an accrual method of accounting because the company had no legal right to collect them; that these items did not in fact exist and could not be used to produce investment income; and that the fact that Congress injected a limited modification of the normal rules of accrual accounting with respect to life insurance reserves did not justify the creation for tax purposes of an otherwise nonexistent asset. In our second opinion in *Western National*, we did agree that because the taxpayer had been required to and did increase its policyholder's reserves by an assumed amount, which might tend to distort the allocation of investment income between the company and the policyholders, it would be proper, in order to avoid such distortion, to make an offsetting adjustment to the asset side of the company's balance sheet in the amount of the net valuation premiums deferred and uncollected but taken into consideration in computing reserves.

Despite what we consider to be logical reasoning in properly applying this rather complex statute in the above two cases, and despite the acceptance of some of our philosophy,[3] all four Courts of Appeals that have considered these issues have disagreed with our conclusions and have held that the gross amount of deferred and uncollected premiums, including loading thereon, must be included in assets for the phase I computations, and in gross premiums with no offsetting deductions for purposes of the phase II computation. In *Franklin Life Insurance Co.* v. *United States, supra*, the Seventh Circuit held that the gross premiums, including loading, must be included in both computations, with no deduction in the phase II computation for loading. In *Jefferson Standard Life Insurance Co.* v. *United States, supra*, the Fourth Circuit held likewise. In reversing this Court in *Western & Southern Life Insurance Co., supra*, the Sixth Circuit also reached the same conclusion with respect to both phases of the tax computation, except that the deduction for loading was not directly involved. And in reversing this Court in *Western National Life Insurance Co. of Texas, supra*, the Fifth Circuit concluded that gross deferred and uncollected pre-

---

[3] In *Liberty National Life Insurance Co.* v. *United States,* 463 F. 2d 1027, 1030 (C.A. 5, 1972), Judge Rives said :

"We discern from the statutory scheme a congressional intent that taxable investment yield be derived only from those assets of a life insurance company which are available to be, even though not actually, invested.

"* * * With respect both to the escrow funds held by Liberty and to those under dominion of the correspondents, it can be said, as the Tax Court has said in construing section 805(b)(4) :

'They do not currently yield any income. They cannot and are not used to produce investment income ; and * * * should not be included in the formula used to determine the rate of return on the company's investment assets.'

*Western National Life Insurance Co.* 1968, 50 T.C. 285, 298, modified, 1969, 51 T.C. 824,² rev'd on other grounds, 5 Cir. 1970, 432 F. 2d 298, We are in accord with that philosophy, * * * [Fn. omitted.]"

miums, including loading, must be included in assets for purposes of the phase I computation. The Fifth Circuit, in *Great Commonwealth Life Insurance Co.* v. *United States, supra,* very recently held that the gross premiums on deferred and uncollected premiums must also be taken into account for the phase II computation, and that an increase in a reserve for loading on unearned premiums is not deductible for that purpose.[4] In *Liberty National Life Insurance Co.* v. *United States, supra,* the Fifth Circuit did not have these issues before it.

The three Courts of Appeals that faced these issues after the Seventh Circuit decision in *Franklin Life Insurance Co.* appear to have adopted the reasoning of the Seventh Circuit in its opinion in that case. In a nutshell, that reasoning seems to be that Congress apparently was cognizant of the assumption upon which life insurance companies compute reserves for annual statement purposes because of State statutory requirements and chose to recognize such assumption in the tax formula it prescribed in the 1959 Act and to base an accrual reporting requirement on that assumption; and the application of accrual principles after that assumption has been made will not permit accrual of the entire annual reserve on the one hand without incident accrual of the full annual premium on the other. *Franklin Life Insurance Co.* v. *United States, supra* at 761. While recognizing that an accrual method of accounting would not require the inclusion of any part of the deferred and uncollected premiums, nevertheless it was the view of those courts that when the taxpayer does accrue them, they must be accrued in full, even though advantage of only a part of them can be used by the taxpayer for determining its base of taxation. See 408 F. 2d 842, 856; 432 F. 2d 298, 302; 460 F. 2d 8, 11.

Thus, our position has been that under an accrual method of accounting, while a fictitious adjustment might be made to assets to offset an overstated liability in order to avoid a distortion, the amount of such adjustment should, at most, not exceed the increase in the reserve account based on the assumption that all premiums are paid in advance, which is the amount of the net annual valuation premiums, exclusive of loading. We have not recognized that accrual accounting would permit any other adjustment, particularly when to do so would throw the formula out of balance on the other side. On the other hand, the Courts of Appeals have concluded that if any amount of the deferred and uncollected premiums are treated as being accrued for any purpose, then the total amount of the annual premiums, including loading, must also be treated as being accrued, even though this may cause distortion in favor of the Government for tax purposes.

---

[4] The Court did allow accrual and deduction of agents' commissions on the deferred and uncollected premiums.

An appeal of this case would normally lie to the Tenth Circuit, which has not yet had the occasion to express its views on these issues. Under the policy of this Court expressed in *Jack E. Golsen*, 54 T.C. 742, 756–757 (1970), affd. 445 F. 2d 985 (C.A. 10, 1971), certiorari denied 404 U.S. 940 (1971), we would not necessarily be bound by the decisions of the other four circuits. However, we fully realize that the Tenth Circuit and other circuits would be strongly inclined to follow the four circuits that have already decided these issues. As said by Judge Tuttle in *Western National Life Insurance Co. of Texas* v. *Commissioner, supra* at 301:

> While, of course, we are not bound by the decisions of the Courts of Appeals of the two circuits which have heretofore passed upon precisely this same question, we think it appropriate to say that it would take extremely cogent reasoning to cause us to take a different view on a matter of statutory construction.

This Court has recognized its obligation to promote uniform application of the internal revenue laws, *Jack E. Golsen, supra*, and for that reason we have not always followed reversals by the Courts of Appeals. See *Arthur L. Lawrence*, 27 T.C. 713 (1957), as modified by *Jack E. Golsen, supra*. But we also recognize that at times the best way for us to promote uniformity is to bow to higher authority, even though we may not agree with the views expressed thereby, particularly where there are no appellate courts supporting our views. We think this is such a situation. So, we conclude, because of the decisions of the Courts of Appeals above discussed, that petitioner must include in its assets for purposes of computing the phase I tax, and in its gross premiums for purposes of computing its phase II tax, the gross amount of its deferred and uncollected premiums, including loading, and that it is not entitled to a deduction with regard to loading in computing its phase II tax.[5]

---

[5] Petitioner cites as error in the petitions both the inclusion in gross premiums under sec. 809(c) and the disallowance of a deduction under sec. 809(d) of the amount of the increase in loading on premiums deferred and uncollected, and also the disallowance of commission expense as "other deductions" under sec. 809(d)(12) for the year 1968. However, on brief, counsel concentrates primarily on the argument that such loading should not be included in gross premium income, and mentioned the deduction claim only alternatively, in one sentence. No argument was made about the deductibility of commission expense on brief.

We recognize that the Fifth Circuit, in *Great Commonwealth Life Insurance Co.* v. *United States*, 491 F. 2d 109 (C.A. 5, 1974), allowed a deduction for phase II purposes of agents' commissions on deferred and uncollected premiums, which we assume comprises a large part of the loading factor included in such premiums. However, no argument was made on this point in this case and we cannot separate it out of "loading" per se, which was the item argued to us. See also *United Life & Accident Insurance Co.* v. *United States*, 329 F. Supp. 765 (D.N.H. 1971).

We agree with the statement made by Judge Thornberry in his concluding paragraph in the *Great Commonwealth* case:

"The result we reach is admittedly an imperfect one. None of the amounts under discussion are properly accruable under normal accounting practices. It would be far more accurate, we think, for the company to disregard deferred and uncollected premiums for all tax purposes, with the Commissioner's approval, of course. * * *"

On brief taxpayer makes two additional arguments with regard to the phase I tax computation that have not received specific attention from the Courts of Appeals that have considered that issue: first, that deferred and uncollected premiums have no tax basis to include under section 805(b)(4), and second, that loading thereon, if an asset, is an asset used by taxpayer in carrying on an insurance business, excludable under the definition of assets contained in section 805(b)(4). While the Courts of Appeals have not mentioned these arguments in their opinions, attention was directed to these arguments in both of our opinions in *Western National Life Insurance Co. of Texas*, 50 T.C. 285, 297 (1968), and 51 T.C. 824, 827–829 (1969), and in our opinion in *Western & Southern Life Insurance Co.*, 55 T.C. 1036, 1043 (1971), and we assume consideration has been given to them by the Courts of Appeals.

## 2. *Whether Petitioner's Mortgage Escrow Funds Constituted Assets of Petitioner Within the Meaning of Section 805(b)(4)*

Respondent determined that petitioner should have reported as an asset under section 805(b)(4) $212,854 in mortgage escrow funds which it held [6] but did not so report in 1965. Petitioner counters that it was justified in not reporting the funds as an asset in that year and argues further that it erroneously did report, and that respondent erroneously failed to exclude, as assets the following amounts held as mortgage escrow funds:

| Year | Amount |
|------|--------|
| 1966 | $212,128 |
| 1967 | 193,769 |
| 1968 | 173,515 |

If petitioner is correct on this point, the effect would be to reduce its reported taxable investment income in the last 3 years at issue.

Those courts which have considered this question have held in favor of petitioner's position. *Liberty National Life Insurance Co. v. United States, supra; Jefferson Standard Life Insurance Co. v. United States*, 272 F. Supp. 97, 125 (M.D.N.C. 1967); [7] *Franklin Life Insurance Co. v. United States*, an unreported case (S.D. Ill. 1967, 19 A.F.T.R. 2d 1734, 67–2 U.S.T.C. par. 9515). The only authority cited by respondent in support of his position is Rev. Rul. 66–31, 1966–1 C.B. 170.

---

[6] Part of each payment made by certain borrowers on mortgage loans extended by petitioner included a sum for real estate taxes and insurance on the mortgaged property. Petitioner held such sums, along with minor amounts of withholding taxes, in escrow as trustee under the terms of the mortgage loans and deeds of trust under which the payments were made, disbursing them as taxes and insurance payments came due.

[7] In *Jefferson Standard Life Insurance Co. v. United States*, 408 F. 2d 842 (C.A. 4, 1969), the only item involved was mortgage escrow funds received, held, and applied by petitioner's mortgage correspondents. This issue was apparently not appealed in either *Jefferson Standard* or *Franklin Life Insurance Co. v. United States*, 399 F. 2d 757 (C.A. 7, 1968).

This issue was discussed at length by the Court of Appeals for the Fifth Circuit in *Liberty National Life Insurance Co.* v. *United States, supra.* We agree with the reasoning and conclusion of the court in that case on this issue and conclude, as it did, that mortgage escrow funds are not includable in petitioner's assets within the meaning of section 805(b)(4) for purposes of computing the phase I tax.

Briefly, resolution of this issue is determined by the fact that these mortgage escrow funds are held by petitioner as trustee—not as "assets of the company" as required by section 805(b)(4). Also, as noted in *Liberty National Life Insurance Co.* v. *United States, supra* at 1034, and our first opinion in *Western National Life Insurance Co. of Texas, supra* at 298, to qualify as an asset under section 805(b)(4), an item must be both available for and capable of investment, i.e., of producing investment yield. Petitioner, as trustee of the escrow funds, cannot lawfully disburse them except to satisfy the trust agreement. *Liberty National Life Insurance Co., supra* at 1029. A trustee may not use trust funds for his own profit, and if he does, he must account, and is liable to the beneficiaries for the profit made. *Fulton National Bank* v. *Tate*, 363 F. 2d 562, 570 (C.A. 5, 1966); *In re Bridgford Co.*, 237 F. 2d 182, 185 (C.A. 9, 1956). The trustee's accountability does not change if trust funds are commingled with the trustee's own. *Liberty National Life Insurance Co., supra* at 1030. Absent a showing that the escrow funds were actually used for investment that would in some way inure to the benefit of petitioner, such as the freeing of other assets for investment, they cannot and should not be considered "assets of the company" for purposes of the phase I tax computation.

Respondent argues (1) that in economic terms, petitioner and not the mortgagors had the primary interest in the mortgaged properties and thus that petitioner did not truly hold the funds for the benefit of the mortgagors; (2) that petitioner did profit by its holding of the escrow funds, in that funds otherwise unavailable are thereby freed for investment; and (3) that petitioner benefited by disbursement of the funds because it increased the security of the loans. None of these arguments are convincing. There is insufficient evidence to support the second argument and neither argument (1) nor (3) would make the mortgage escrow funds "assets of the company" or available for investment by the petitioner for the benefit of it and its policyholders.

3. and 4. *Inclusion in Assets under Section 805(b)(4) and in Gross Investment Income under Section 804(b)(1) of Interest on Mortgage Loans on which Interest Was More Than 90 Days Past Due and Interest on Mortgage Loans in Foreclosure*

In 1967 and 1968, petitioner failed to report as assets under section 805(b)(4), and as gross investment income under section 804(b)(1)

(A),[8] amounts constituting interest on mortgage loans more than 90 days past due and interest on mortgage loans in foreclosure.

The parties do not appear to disagree on the principles applicable to this question. Under section 818(a), *supra*, petitioner is required to be on an accrual basis, and—

> Where a taxpayer keeps accounts and makes returns on the accrual basis, it is the right to receive and not the actual receipt that determines the inclusion of an amount in gross income. *Spring City Foundry Co.* v. *Commissioner*, 292 U.S. 182; *Continental Tie & Lumber Co.* v. *United States*, 286 U.S. 290; *Lucas* v. *American Code Co.*, 280 U.S. 445; and *American National Co.* v. *United States,* 274 U.S. 99. But where there exists reasonable grounds for believing, at the time the right to receive income becomes fixed, that such income will never be received, it need not be included in gross income. *O'Sullivan Rubber Co.*, 42 B.T.A. 721; affd., 120 Fed. (2d) 845. [*Union Pacific Railroad Co.*, 14 T.C. 401, 410 (1950).]

The primary question here is thus whether petitioner had reasonable grounds in 1967 and 1968 to believe that interest on mortgage loans which had interest more than 90 days overdue in those years, and on mortgage loans in the process of foreclosure, would never be received. We find that petitioner has failed to carry its burden of proof.

Petitioner relies on the fact that the NAIC annual statement does not require an insurance company to accrue interest on mortgage loans more than 90 days past due and on mortgage loans in foreclosure and argues that this constitutes an accounting judgment that there is sufficient doubt of the collectibility of additional interest to require its nonaccrual. Petitioner also argues that because sometime after the years here involved the mortgaged properties were bid in by petitioner at foreclosure sales at only the amount of principal then due indicates that there was little expectation that additional interest could be collected, citing section 1.166–6(b)(2) of the regulations as support for the conclusion that the bid price was determinative of the fair market value of the mortgaged properties. But these assumptions are far from proof that there were reasonable grounds for believing at the end of the years here involved that no more interest would be received on these loans. Petitioner offered no direct evidence of the fair market value of the mortgaged properties; in fact, what evidence there is indicates those values were higher than the prices for which they were bid in at foreclosure sales. Nor do we have any evidence of the noncollectibility of the defaulted interest from the mortgagor or endorsers on the notes. The record does contain evidence that petitioner had filed suits for deficiency judgments against three indi-

---

[8] Sec. 804(b)(1)(A):

(b) GROSS INVESTMENT INCOME.—For purposes of this part, the term "gross investment income" means the sum of the following:

(1) INTEREST, ETC.—The gross amount of income from—

(A) interest, dividends, rents, and royalties,

viduals who had endorsed for mortgage notes that were not in foreclosure in 1967 and 1968, which would indicate that even in 1969 petitioner had reasonable expectation of collecting the full remaining amount due on the mortgage loans, including interest and attorneys' fees.

Even assuming that an NAIC accounting requirement could serve as a surrogate for other proof of reasonable grounds to believe that an item of income would not be received, we find that petitioner has not established that the NAIC did in fact require the treatment petitioner gave the interest here at issue. Petitioner introduced no direct evidence at trial of the NAIC rules or regulations. Examination of petitioner's annual statements for the years at bar shows that the forms approved by the NAIC at most *allowed* petitioner's treatment of the interest items at issue: there is nothing to show that they required it.

We hold for respondent on these issues.

5. *Inclusion of Unearned Policy Loan Interest in Gross Investment Income under Section 804(b)(1)*

Petitioner makes loans to policyholders on the sole security of policies which have cash values available. Interest on policy loans is booked in advance on an annual basis measured by the anniversary date of the policy. The insured may repay a policy loan at any time and receive a corresponding reduction or refund of interest owed or due. If interest is not paid by the insured at the beginning of the policy year, it is merely added to the existing loan principal at that time and thereafter itself bears interest at the same rate, beginning with the next succeeding policy year. In the years at bar, petitioner included policy loan interest, whether actually prepaid or merely added to principal, in its gross investment income under section 804(b)(1) only to the extent such interest had been earned by the passage of time at the end of the calendar year. On brief, however, petitioner does not contend that interest actually prepaid in cash should be excluded from gross investment income; only the unearned interest not prepaid should be so excluded. Consequently, we will limit our consideration of this issue to whether the unearned portion of the interest that was not prepaid in cash but was simply added to principal must be included in investment income.

Respondent determined that petitioner should have included in its gross investment income for the years at bar the following amounts representing policy loan interest which remained unearned at the end of each year:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1965 | $2,927 | 1967 | $299 |
| 1966 | 7,782 | 1968 | 5,294 |

Respondent also determined that under section 481 relating to adjustments required by changes in accounting method, the increase in unearned interest on policy loans from January 1, 1954, to December 31, 1964—a total of $48,032—was to be included in petitioner's gross investment income for 1965.

We begin again with the requirement of section 818(a) that petitioner be on an accrual method of accounting. Section 1.446–1(c)(1)(ii) of respondent's regulations provides that:

Generally under an accrual method, income is to be included for the taxable year when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. * * *

In *Spring City Co.* v. *Commissioner*, 292 U.S. 182, 184 (1934), the Court stated:

Keeping accounts and making returns on the accrual basis, as distinguished from the cash basis, import that it is the *right* to receive and not the actual receipt that determines the inclusion of the amount in gross income. When the right to receive an amount becomes fixed, the right accrues. * * *

In *Guarantee Title & Trust Co.* v. *Commissioner*, 313 F. 2d 225, 227 (C.A. 6, 1963), reversing a Memorandum Opinion of this Court, the court, interpreting *Spring City Co.* stated:

If the right to receive income is contingent upon the happening of a future event, the right cannot be said to arise or exist in the taxable year to be accounted for as income under the accrual method of accounting. * * *

The court held that additional mortgage-servicing fees, which it could not be determined as of the end of the taxable year would be received, need not be accrued as income.

In *Etheridge & Vanneman, Inc.*, 40 T.C. 461 (1963), this Court resolved to follow the approach of the Sixth Circuit in *Guarantee Title & Trust Co.* See also *Gunderson Bros. Engineering Corp.*, 42 T.C. 419, 428 fn. 14 (1964). Finally, in *Gunderson Bros. Engineering Corp.*, *supra*, the Court considered the accruability of finance charges added to cash sales prices of trucks and trailers. The purchaser was entitled to a refund of a portion of the finance charge upon early payment of the balance due on the deferred payment contract. The Court concluded that because of the borrower's right to a refund of a portion of the finance charge upon prepayment, the seller's right to the income from the finance charge was not fixed until a payment became due, and the seller was not required to include the entire amount of the finance charge in income in the year of the sale. The Court likened the finance charge to interest on a loan subject to a right of repayment, which may be counted as income to an accrual basis taxpayer only as earned with the passage of time. See also *Luhring Motor Co.*, 42 T.C. 732 (1964).

It follows that in the present case petitioner need not accrue any interest on policy loans not prepaid in cash and not earned by the end of the taxable year.

Respondent cites two Circuit Courts of Appeals decisions which reached results different from ours here, *Franklin Life Insurance Co.* v. *United States, supra,* and *Jefferson Standard Life Insurance Co.* v. *United States, supra.* In both cases the courts held that all policy loan interest must be accrued at the beginning of each policy year, whether actually prepaid or merely added to the principal of the loan, although in *Franklin* the court seemed to rely rather heavily on actual prepayment of interest in reaching its conclusion. In *Jefferson Standard,* the court relied exclusively on *Franklin* for its conclusion on this issue. In *Franklin* the court relied for its legal conclusion on *Schlude* v. *Commissioner,* 372 U.S. 128 (1963), and on the "claim of right" doctrine enunciated in *North American Oil* v. *Burnet,* 286 U.S. 417, 424 (1932). For the reasons hereinafter stated, we respectfully disagree that the latter two cases should be controlling on this issue.

*Schlude,* like *Guarantee Title & Trust Co.* v. *Commissioner, supra,* derived from *Spring City Co.* v. *Commissioner, supra.* In *Schlude,* the taxpayer received, at times specified by contract, prepayments in cash or negotiable notes for future services to be rendered on demand. Even if such services were not demanded, the taxpayer was nonetheless contractually entitled to insist upon payment in full for them "and to retain whatever prepayments were made without restriction as to use and without obligation of refund." 372 U.S. at 135–136. The Court cited the passage from *Spring City Co.* quoted above and concluded that under the facts before it the right to receive the prepayments had become fixed "at least at the time they became due and payable," 372 U.S. at 137, and that the prepayments were thus accruable in full as income in the year received.

The "claim of right" doctrine, as stated in *North American Oil* and relied on in *Franklin Life Insurance Co.,* is that:

If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to [show on his] return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. * * * [286 U.S. at 424.]

As we view the facts in this case on this issue, petitioner received nothing from the borrower when it added the prepaid interest to the principal of the loan; there was simply a temporary reallocation of funds petitioner already had on its books. Furthermore, petitioner was not entitled to retain whatever might even be considered as prepayments without an obligation to refund. Thus, *Schlude* and *North American Oil* are inapposite.

Because we decide that unearned interest on policy loans that is added to principal is not properly includable in petitioner's gross investment income until earned, we must also hold that respondent erred in applying section 481 to increase petitioner's income in 1965 by the $48,032 increase in unearned policy loan interest from January 1, 1954, to December 31, 1964. To the extent that respondent's adjustment included interest actually prepaid during the years 1954–64, which petitioner does not now claim should be excluded from investment income, we will leave it to the parties to determine whether such an item is a sufficiently "material" item to justify the adjustment under section 481.

### 6. *Deductibility of Legal Fees*

In 1965, petitioner acquired all of the outstanding stock of American Benefit Life Insurance Co. (ABL), which it subsequently liquidated. Petitioner treated the transaction as a purchase of ABL's assets and claimed amortization deductions, now acquiesced in by respondent, with respect to the purchase price as set out in our Findings of Fact. Respondent does not contest that petitioner is also entitled to amortize legal fees paid in 1967 in connection with the liquidation of ABL. Petitioner, however, asserts that it should be allowed to deduct the entire amount on its 1967 return. We disagree.

Respondent correctly argues that *Woodward* v. *Commissioner*, 397 U.S. 572 (1970), affirming 410 F. 2d 313 (C.A. 8, 1969), affirming 49 T.C. 377 (1968), and *United States* v. *Hilton Hotels Corp.*, 397 U.S. 580 (1970), reversing 410 F. 2d 194 (C.A. 7, 1969), affirming 285 F. Supp. 617 (N.D. Ill. 1968), control the present question. In those cases, the Supreme Court held that "expenses * * * that arise out of the acquisition of a capital asset are capital expenses." *United States* v. *Hilton Hotels Corp., supra* at 583.

We think the same principle applies here. The legal expenses involved arose in the process of acquisition of ABL's assets and should be treated in the same manner as the other costs of acquisition. Furthermore, the record contains no evidence upon which we could allocate the legal fees between the expense of acquiring capital assets and ordinary and necessary business expenses if we were so inclined.

Reviewed by the Court.

*Decisions will be entered under Rule 155.*

---

SIMPSON, *J.*, concurring: I agree with the Court's conclusions in this case, including its treatment of the interest on loans to policyholders. However, as I understand the decisions of the circuit courts in *Franklin Life Insurance Co.* v. *United States*, 399 F. 2d 757 (C.A. 7, 1968),

certiorari denied 393 U.S. 1118 (1969), and *Jefferson Standard Life Insurance Co.* v. *United States*, 408 F. 2d 842 (C.A. 4, 1969), those cases are distinguishable, and we are not faced with a choice of whether to follow them in this case.

In *Jefferson Standard*, the court understood the issue to be the same as that in *Franklin Life* and decided the issue simply on the basis of that court. In *Franklin Life*, it is clear that the court considered that it was dealing with interest which had been paid and was in the hands of the company. In setting forth the facts, the court stated at page 761:

Under the express terms of taxpayer's policy loan agreements with borrowers interest is paid in advance at the time of the loan to the end of the current policy year and annually thereafter on the policy anniversary date for the ensuing year, and interest not paid when so due is added to the principal of the existing loan. * * *

It stated at page 762 the company's policy to be: "Interest on policy loans is taken into income or assets only as ratably earned." In explaining the reasons for its conclusions, the court clearly indicated that it considered that it was dealing with interest already prepaid; it said at page 762:

But, non-deferral of prepaid items is not foreign to permissible or required accrual accounting for income tax purposes. * * * And, here the taxpayer receives the interest under a binding agreement with the borrower calling for its receipt and without restriction upon its use by the taxpayer. The money is "earned" in a context sufficient for full tax recognition in that taxpayer, when it receives the interest, is fully entitled to it under the express terms of the policy loan agreement. * * *

It found that the *Gunderson Bros. Engineering Corp.*, 42 T.C. 419 (1964), and *Luhring Motor Co.*, 42 T.C. 732 (1964), cases were not apposite because in those cases, the taxpayer had not actually received the payments in advance. The court's conclusion related only to prepaid interest; it said at page 763: "We conclude that the District Court's conclusion with respect to prepaid and capitalized policy loan interest was erroneous."

The facts of the case now before us are significantly different: Judge Drennen found that, although the interest is put on the books of the company at the time the loan is made and at the beginning of each policy year, most of the interest is not paid at those times, and no interest is charged on the interest until the beginning of the succeeding policy year. Initially, the company sought to exclude interest which was in hand but which was not earned at the end of the calendar year, but subsequently, it changed its position and admits that all interest actually received must be included; it now seeks to exclude only the interest which has not been received and is not earned at the end of the calendar year.

In view of the difference between the facts dealt with by the Seventh Circuit and those in this case, I am convinced that the Seventh Circuit opinion is not applicable to this case. The Seventh Circuit was dealing with money that was in hand, but we are only dealing with money which has not been received and not earned. It is true that the company has a reserve established with respect to the policy, and if the policyholder fails to pay the interest, the company can collect from the reserve. Yet, the mere existence of that fund from which payment can be secured does not indicate to me that this is a situation in which the company should be treated as having actually received payment of the interest. The existence of the loan gives the company a right to receive interest for it, and in the ordinary course of events, it will receive, in addition to a repayment of the principal, interest for the period for which the loan is outstanding. I see no reason to treat the company as having actually received that interest until it is in fact paid to it or until it exercises its right to charge the interest against the reserve.

I agree with Judge Drennen's conclusion that as to the interest not received and not earned, it should not be accruable, but I feel that conclusion is not inconsistent with the opinions of the circuit courts in *Jefferson Standard Life Insurance Co.* v. *United States*, 408 F. 2d 842 (C.A. 4, 1969), and *Franklin Life Insurance Co.* v. *United States*, 399 F. 2d 757 (C.A. 7, 1968), certiorari denied 393 U.S. 1118 (1969).

GOFFE, *J.*, agrees with this concurring opinion.